NORTHPORT IRRIGATION DISTRICT, APPELLEE, V.
J. MICHAEL JESS, DIRECTOR, DEPARTMENT OF
WATER RESOURCES, ET AL., APPELLANTS.
337 N.W.2d 733

Filed August 12, 1983.   No. 82-378.

Paul L. Douglas, Attorney General, and G. Roderic Anderson, for appellants.

Winner, Nichols, Meister, Douglas and Kelly, for appellee.

Carol E. Dinkins, Assistant Attorney General, Jacques B. Gelin and David C. Shilton, for amicus curiae United States of America.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

WHITE, J.

This is an appeal of a permanent injunction against the director and division engineer of the Nebraska Department of Water Resources (State) from requiring the plaintiff, Northport Irrigation District (Northport), to obtain an appropriation permit to pump water from the Upper Dugout Creek into its canals for irrigation. In granting the injunction the trial court found that (1) the United States of America was granted the right under its appropriation No. 768 from the State of Nebraska to recapture seepage and return flow from its project lands; (2) the decision in *United States v. Tilley*, 124 F.2d 850 (8th Cir. 1941), recognized that this appropriation entitled the United States to recapture seepage and return flow before it reaches the North Platte River and that this decision is res judicata as to the issues in this case; and (3) pursuant to contract, Northport is entitled to the rights of the United States under appropriation No. 768.

Northport installed a pump in the Upper Dugout Creek near Bridgeport, Nebraska, and began pumping water from Upper Dugout Creek into canal laterals to serve its district on July 21, 1981. No right of appropriation had been granted to Northport to the waters flowing in the Upper Dugout by the State. The State issued an order to Northport to stop pumping without an appropriation permit on July 22, 1981. Northport complied and filed this action seeking an injunction against the State.

The primary issue in this case is whether seepage waters from lands under an irrigation project or canal, which drain into a natural watercourse, may be collected by the appropriator from the natural watercourse and be applied to further beneficial use by the project or canal, or whether once the waters have returned to a natural watercourse they become public waters and are subject to administration by the State. We will first discuss whether Upper Dugout is a natural watercourse, and then whether all

waters contained in Upper Dugout are public waters.

This action is an action in equity which is reviewed de novo without reference to the findings of fact made by the trial court. *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982).

The Northport Canal crosses the top one-third of Upper Dugout Creek in an east-west direction. Upper Dugout Creek itself flows in a north-south direction and empties into the North Platte River to the south. The stream is approximately 11 miles long, and is fed by a spring in the north that directs the flow to the south but is only large enough to supply the top 4 miles of Upper Dugout Creek with a constant flow of water. Prior to the start of construction on the Northport Canal in 1920, the remaining southern portion of Upper Dugout Creek contained water only after a rainfall, although there was testimony that another small spring from Bratten or Braddon Creek formerly flowed into the center of Upper Dugout before it was artificially dammed. Since the canal began flowing in 1926, the lower portion of Upper Dugout Creek has never had a dry measurement and flows year round. The evidence was quite clear that the only reason for the increased flow was due to seepage waters from lands irrigated by the canal which, through percolation or drainage, had found their way into Upper Dugout Creek.

Northport concedes that ''there's no question here about whether there's a reasonably definite channel.'' Upper Dugout Creek flows in a well-defined channel cut in the soil by the action of the water. The creek has 2- to 3-foot-high natural banks and a 2- to 3-foot-wide bed consisting largely of gravel and sand. On all the maps and plats introduced into evidence, which varied from those originally surveyed and platted in 1877 until the present, Upper Dugout Creek is clearly shown as a creek in a well-defined channel. The photographs offered further serve to

illustrate the well-defined and substantial existence of the watercourse.

A watercourse is defined by statute as "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." Neb. Rev. Stat. § 31-202 (Reissue 1978).

" ' "To constitute a water course, it must appear that the water usually flows in a particular direction; and by a regular channel, having a bed with banks and sides; and (usually) discharging itself into some other body or stream of water. It may sometimes be dry. It need not flow continuously; but it must have a well defined and substantial existence. * * * there is a broad distinction between a stream and brook, constituting a water course, and occasional and temporary outbursts of water occasioned by unusual rains or the melting of snows, flowing over the entire face of a tract of land, and filling up low and marshy places, and running over adjoining lands, and into hollows and ravines which are in ordinary seasons destitute of water and dry." ' " *Barry v. Wittmersehouse, supra* at 912-13, 327 N.W.2d at 35, quoting from *Mader v. Mettenbrink,* 159 Neb. 118, 65 N.W.2d 334 (1954).

The de novo review reveals that Upper Dugout Creek had permanent source headwaters in the north and possibly another in Bratten Creek before its flow to Upper Dugout Creek was dammed. The Upper Dugout Creek headwaters flowed in a southerly direction, with a final discharge into the North Platte River. While the lower portion of Upper Dugout Creek was often dry except for rainfall before the building of the canal, we do not believe that this fact alone negates the existence of a natural watercourse. " 'Those who are acquainted with the streams and water courses of the arid Rocky Mountain region of this country, draining as they do to steep, mountainous areas, with their swift currents running over gravelly and rocky bottoms, know that

often in the dry summer months many of them are entirely dry, at least upon the surface. All of them, nevertheless, have well-defined beds, channels, banks, and currents of water, at least the greater portion of the year, and are in every respect water courses to which water rights may attach. But it would be plainly impracticable in this western part of the country to require that, in order to constitute a water course upon which rights may attach, there must be a continuous, uninterrupted, and perennial flow of water during the entire year, and from year to year. Hence the requirement of the law is that in order to constitute a water course the stream need not flow all of the time.'

. . . .

" ' "Where water, owing to the hilly or mountainous configuration of the country, accumulates in large quantities from rain and melting snow, and at regular seasons descends through long, deep gullies or ravines upon the lands below, and in its onward flow carves a distinct and well-defined channel, which even to the casual glance bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial, such a stream is to be considered a water course, and to be governed by the same rules." ' " *Hoefs v. Short*, 114 Tex. 501, 273 S.W. 785, 787-88 (1925).

In order for a watercourse to exist there must be a permanent supply of water from similar conditions, such as rainfall or snowmelt, which will always produce a flow of water in the same channel and that these conditions will reoccur with some degree of regularity. 1 Kinney, A Treatise on the Law of Irrigation and Water Rights § 302 (2d ed. 1912). This court is not concerned by the evidence which indicated that a portion of the banks of Upper Dugout Creek had been repaired. A natural stream or watercourse does not lose its natural character as

such merely by artificial improvements. 1 Kinney, *supra* at § 301.

We therefore find that Upper Dugout Creek comports with the statutory definition of a watercourse and subsequent cases of this court that have interpreted said statute.

The issue remains as to whether waters which have returned to a natural watercourse become public waters subject to administration by the State.

The right of Nebraska citizens to use the waters flowing in this State is protected by §§ 4, 5, 6, and 7 of article XV of the Constitution of Nebraska, which state as follows: "Sec. 4. . . . The necessity of water for domestic use and for irrigation purposes in the State of Nebraska is hereby declared to be a natural want. (Adopted, 1920.)

"Sec. 5. . . . The use of the water of every natural stream within the State of Nebraska is hereby dedicated to the people of the state for beneficial purposes, subject to the provisions of the following section. (Adopted, 1920.)

"Sec. 6. . . . The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest. Priority of appropriation shall give the better right as between those using the water for the same purpose, but when the waters of any natural stream are not sufficient for the use of all those desiring to use the same, those using the water for domestic purposes shall have preference over those claiming it for any other purpose, and those using the water for agricultural purposes shall have the preference over those using the same for manufacturing purposes. Provided, no inferior right to the use of the waters of this state shall be acquired by a superior right without just compensation therefor to the inferior user. (Adopted, 1920.)

"Sec. 7. . . . The use of the waters of the state for power purposes shall be deemed a public use and shall never be alienated, but may be leased or other-

wise developed as by law prescribed. (Adopted, 1920.)''

Neb. Rev. Stat. § 46-203 (Reissue 1978) establishes a "first in time is first in right" seniority system for water appropriations. Priority of appropriations dates from the filing of the application in the office of the Department of Water Resources, under Neb. Rev. Stat. § 46-205 (Reissue 1978).

Appropriation by the public requires an application to the Department of Water Resources setting forth certain information, such as the applicant's name, the source from which the water shall be appropriated, the amount of water for which appropriation is desired, the location from which the diversion will be made, the estimated time for completion of the diversionary structure, the point in time at which beneficial application of the water will be made to the land, the purpose for which the diverted water will be applied, and any additional facts required by the department. Neb. Rev. Stat. § 46-233 (Reissue 1978). The Department of Water Resources must then record the application, examine it for sufficiency, and either deny or approve it with or without conditions. Neb. Rev. Stat. §§ 46-233 and 46-235 (Reissue 1978). The applicant is given 6 months after approval of an application to file a plat of the area and to commence construction of the diversion works. Failure to comply with these requirements of Neb. Rev. Stat. §§ 46-237 and 46-238 (Reissue 1978) works a forfeiture of the appropriation and all rights thereunder.

"The corpus of running water in a natural stream is not the subject of private ownership. 'Such water is classed with light and the air in the atmosphere. It is *publici juris* or belongs to the public. A usufructuary right or right to use it exists, and the corpus of any portion taken from the stream and reduced to possession is private property so long only as the possession continues. These principles were borrowed by the common law from the civil law and

in turn were borrowed by the law of appropriation from the common law.' " *Rock Creek Ditch etc. Co. v. Miller*, 93 Mont. 248, 258, 17 P.2d 1074, 1076 (1933). In accord, see, *Rogers v. Petsch*, 174 Neb. 313, 117 N.W.2d 771 (1962), and *Slattery v. Dout*, 121 Neb. 418, 237 N.W. 301 (1931), which hold that a landowner does not have an exclusive right to use waters to the injury of senior appropriators. There are approximately 20 senior appropriators downstream from Upper Dugout Creek who would be adversely affected by the issuance of an injunction in this case. This court is concerned that these prior appropriators should have been joined as necessary parties to this lawsuit. This issue was neither briefed nor argued by counsel for either side. However, we find it unnecessary to comment further in view of our ruling in this case.

Northport's contention that, by bringing canal seepage water into the watershed of Upper Dugout Creek, it has become entitled to the use of that excess water for the district is simply untenable. While the *Rock Creek* case cites an exception to the general public ownership rule for an appropriator who by his own exertions increases the available supply of water in a stream and therefore has the right to appropriate it, the exception "contemplates the increase of a stream occasioned through the exertions of man directed to that end, and does not contemplate accessions to the stream through the process of nature, as by percolating waters." 93 Mont. at 262, 17 P.2d at 1078. This argument is without merit.

Northport's arguments that the case of *United States v. Tilley*, 124 F.2d 850 (8th Cir. 1941), is res judicata upon the issues in this case, or that Northport was a privy to a prior appropriation, are also without merit. To provide water for Northport and other irrigation districts in Nebraska, the United States applied for and obtained water appropriation permit No. 768 from the State of Nebraska in 1904,

which permitted the diversion of 230 cubic feet per second of water from the North Platte River. In 1912 the United States posted and recorded a notice of appropriation which claimed "all unappropriated surface, surplus, waste, seepage, return, drainage or developed waters flowing in any and all of said streams, creeks, arroyos, gulches, ravines, depressions and drainage channels within the limits of the North Platte Project of the United States Reclamation Service." In 1918 the United States entered into a contract with the Northport Irrigation District. Under the contract the United States claimed all waste, seepage, spring, and percolating water arising within the district. In 1941 the United States appealed a decision of the U.S. District Court for the District of Nebraska in which one of the defendants was A. C. Tilley, state engineer and head of the Department of Roads and Irrigation of the State of Nebraska. The Eighth Circuit Court reversed the District Court and found that certain drains below the Tri-State Canal were "developed for the express purpose of collecting and removing the seepage," *United States v. Tilley, supra* at 861, and therefore the United States should be able to collect that seepage and reapply it to the land without a new appropriation. The decision was based upon the previous case of *Ramshorn Ditch Co. v. United States*, 269 F. 80 (8th Cir. 1920), in which the Eighth Circuit Court held that the United States was entitled to collect seepage in a particular drain without a new appropriation if it was within a reasonable time after the seepage began. Northport claims to be in privity with the United States by virtue of its contract for the purchase of the Northport Canal and therefore the *Tilley* and *Ramshorn* cases are res judicata on the instant issues.

We do not find either the *Tilley* or *Ramshorn* cases to be controlling or dispositive of the issues before this court.

Where different proof is required, a judgment in

one action does not preclude another action. *Suhr v. City of Scribner*, 207 Neb. 24, 295 N.W.2d 302 (1980). The present case involves a different canal and a different watercourse. The *Ramshorn* case also relied upon Rev. Stat. §§ 3426 and 3427 (1913), which statutes have since been repealed. Federal law specifically defers to state appropriation laws in determining the right of the United States to appropriate water within a state. National Irrigation Act of 1902, 43 U.S.C. §§ 371 et seq. (1976); *California v. United States*, 438 U.S. 645, 98 S. Ct. 2985, 57 L. Ed. 2d 1018 (1978).

The appropriation permit granted by the State of Nebraska to the United States defines the appropriation rights which Northport possesses in natural flow waters within the State of Nebraska. Neb. Rev. Stat. § 46-231 (Reissue 1978). Appropriation permit No. 768 lists only the North Platte River as the source of the water. No mention was made in the appropriation permit of diversion or appropriation from the waters in Upper Dugout Creek. A change of point of diversion was sought by Northport in 1979 and no mention was made in the application, order, or map that Northport considered Upper Dugout Creek as a source of water.

Northport also relies on the notice of appropriation filed by the United States, which it maintains is support for its right to appropriate water from Upper Dugout Creek. We are unable to find any Nebraska statute, past or present, which has permitted the United States to appropriate water merely by filing a notice of an intent to do so and posting said notice by several creekbeds. Further, while the notice mentions other creeks by name, it fails to refer to Upper Dugout Creek or even the range or township within which it is located.

Even assuming arguendo that Northport did have a valid appropriation permit, it would have terminated from nonuse. The waters from the Northport Canal have seeped into the watershed of Upper Dug-

out Creek for over 55 years without recapture. As mentioned previously, there are now several downstream appropriators with senior rights to the water. These water users have been granted appropriation permits based on the seniority appropriation system. A filing date must be supported by use. Neb. Rev. Stat. § 46-229 (Reissue 1978). Nonuse for over 3 years terminates the right by statutory cancellation proceedings. Neb. Rev. Stat. § 46-229.02 (Reissue 1978). In *State v. Nielsen*, 163 Neb. 372, 79 N.W.2d 721 (1956), this court held that where the evidence shows that irrigation rights have not been used for more than 10 years, the provisions of Neb. Rev. Stat. § 25-202 (Reissue 1979) cause the clear loss of the appropriation right, independent of any cancellation proceeding.

For all of the above reasons the judgment is reversed and the cause dismissed.

REVERSED AND DISMISSED.