14.030(2)(B)–(C) as discussed in the preceding Memorandum.

**IT IS FURTHER ORDERED** that the application of the Knights of the Ku Klux Klan, Realm of Missouri to participate in the Adopt–a–Highway program was properly denied by letter of August 14, 1997, for the stated reason of a reasonable and viewpoint neutral moratorium on adoptions of highways within the city limits of St. Louis, Missouri.

**IT IS HEREBY FINALLY ORDERED, ADJUDGED and DECREED** that this matter is **DISMISSED** with prejudice except to the extent that this Court retains jurisdiction to enforce the above described injunction under 42 U.S.C. § 1983.

**UNITED STATES of America, Plaintiff,**

v.

**Rex G. WHEELER, Defendant.**

No. 4:98CR3044.

United States District Court, D. Nebraska.

March 22, 1999.

Alan L. Everett, Assistant United States Attorney, Lincoln, NE, for plaintiff.

Steven E. Achelpohl, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

When does a river channel cease to become a part of the river? This case presents that interesting question in the context of a criminal prosecution.

The United States has charged Rex G. Wheeler with violating the Lacey Act. *See* 16 U.S.C. § 3371, *et seq.* The United States claims that Wheeler unlawfully guided Georgia hunters during a deer hunt on a state game refuge. The boundaries of the game refuge are: "All that portion of the State of Nebraska on the North Platte River and for twenty rods[1] back of the banks of said stream on the land side in Garden County, Nebraska, and, except for the repair for existing alterations, fu-

ture alterations in the banks by the damming of such streams shall not be recognized as effecting legal changes of such refuge boundary." Neb.Rev.Stat. § 37–412 (Michie 1995).[2] The parties waived a jury trial.

The government argues that the boundaries of the game refuge extend 20 rods north of the Midland–Overland channel. The defendant argues that since the channel remains open only because of the long standing maintenance by an irrigation company, the water course no longer constitutes a river channel. If the government is correct, Wheeler may be guilty.[3] If the defendant's position is adopted, he is innocent.

Applying the rule of lenity to the Nebraska statute that forms the predicate for the charges, I find and conclude that Wheeler is not guilty of the government's accusations.[4] In so ruling, I do not decide the boundaries of the refuge. Rather, I decide that Wheeler must be given the benefit of the statutory doubt. My reasons for this decision are set forth briefly below. *See* Fed.R.Crim.P. 23(c).

## I. BACKGROUND

I first describe facts that are basic to an understanding of this case. I then examine the text, structure and legislative history of the statute defining the boundaries of the refuge. I also review other interpretative aids.

### A.

The defendant was charged with four felony counts of violating 16 U.S.C. §§ 3372(a)(2)(A) and 3373(d)(1)(B). This statutory scheme makes it unlawful for any person to sell in interstate commerce

---

1. 20 rods equals 110 yards.

2. *See* explanation of renumbering of key statutes *infra* note 4.

3. Even if the boundary was as suggested by the government, Wheeler asserts various other defenses. It is unnecessary to discuss and resolve these other defenses given the decision I reach in this case.

4. I deny the defendant's reserved motion for judgment of acquittal as moot since I now find the defendant not guilty on the merits.

wildlife taken in violation of the laws or regulations of a state. Guiding a hunter for a fee is deemed to be a sale under federal law. 16 U.S.C. § 3372(c)(1). The Nebraska law alleged to have been violated is Neb.Rev.Stat. § 37–418 (Michie 1995) (making it unlawful to hunt game animals within the boundaries of a game refuge). Neb.Rev.Stat. § 37–412 (Michie 1995) defines Garden County refuge.[5]

Wheeler is a former chief deputy county sheriff in Garden County, Nebraska. Garden County is intersected by the North Platte river. The area is rich in wildlife, including deer. In addition to his law enforcement duties, Wheeler ran a guide service. Along the banks of the North Platte river is a game refuge known as the Garden County Game Refuge. Although the refuge is protected by state law, the land is privately owned.

During deer hunting season in November of 1997, Wheeler guided three hunters from Georgia. He was paid $4000 for the hunt. He used a portion of the money to rent land upon which the hunters could hunt, and he kept the rest. Some of the land rented by Wheeler was the Beam property located immediately north of a portion of the Garden County Refuge.

The hunters shot and killed four deer. Everyone agrees that they shot the deer at locations suggested by Wheeler. It is also undisputed that Wheeler prepared "deer stands" in the trees at those locations. At Wheeler's suggestion, the hunters stood on the stands for the purpose of shooting the animals. Wheeler agrees that the deer

stands are within 20 rods of the north bank of the Midland–Overland water course. Furthermore, Wheeler knew that the deer stands and the hunting activity was going to and did take place within 20 rods of that area. In contrast, it is also undisputed that the deer stands and the hunting activity occurred far beyond 20 rods from the ·north bank of the main channel of the North Platte river.[6]

In the relevant area, the North Platte River generally flows south and east. The river has various channels and it has a sandy bottom. The location of the numerous banks of the river change over time. New river channels are constantly being made by the course of the river and old channels are filled by sediment deposits. When that occurs, the channel no longer carries river water.

Several irrigation companies divert water from the river. The Midland–Overland irrigation company is one of those companies. The predecessors of the Midland–Overland company began operating prior to 1900 by diverting water from the river at points relatively near the site of the dispute. The farmers who contract with the Midland–Overland company use the water exclusively for the purpose of irrigating crops.

The Midland–Overland irrigators have been diverting water from the river at the specific site known as the Bennet sand dam since at least 1948.[7] The water is diverted by the Bennet sand dam from a part of river. The water runs into the disputed channel due to the obstruction

---

5. Since the indictment was filed, those statutes have been renumbered and slight changes have been made to them. *See* Neb. Rev.Stat. § 37–706(1) (Michie 1998) (defining Garden County refuge) and Neb.Rev.Stat. § 37–708 (Michie 1998) (making it unlawful to hunt game animals within the boundaries of a game refuge). For purpose of this case, there are no material differences between the new statutes and the predecessors charged in the indictment. In this opinion, I refer to the statutes as they were codified at the time of the indictment.

6. It is extremely difficult to precisely describe the "crime scene" in words. I prepared a sketch to help me understand the testimony, and that sketch is attached to this opinion.

7. Diversions also are made at the Wilkinson dam upstream (north and west) from the Bennet dam. However, the reach of watercourse between the Bennet dam and the Wilkinson dam is not directly involved in this case. For purposes of this case, I assume that the stretch between the Wilkinson dam and the Bennet dam is part of the river.

caused by the Bennet sand dam.[8] However, not all the river water is diverted by the Bennet sand dam. The river, and the remaining water, continues to the south and east at the Bennet sand dam while the disputed channel runs in a more easterly direction.

In the fall, the Bennet dam is breached by Midland–Overland irrigation company.[9] Most of the water then flows in the river as opposed to flowing into the disputed channel. However, after the dam is breached, the disputed channel sometimes carries water over some or all of its length. At other times the disputed channel is dry.

When the Bennet dam is operating, the disputed channel carries the water east to what everyone agrees is an irrigation canal. The path of the disputed channel branches. One branch of the disputed channel becomes the irrigation canal and the other becomes a channel that returns to the river (the "river return"). If the disputed channel is dammed at this branch point, water returns to the river rather than into the irrigation canal. Thus, the Midland–Overland company can "spill" excess water back to the river. The disputed channel, the "river return" and the irrigation canal appear to be nearly identical in physical character; that is, the channel, return and canal are depressions in the soil rather than fabricated structures. With the exception of a "head gate" and a measuring device at the beginning of the canal, there is very little to distinguish the disputed channel from the canal.

The deer were killed in an area adjacent to and north of the disputed channel. The Bennet dam is west of this spot. The river return and the canal are located east of the area where the deer were shot. In other words, the area where the deer were killed is between the Bennet dam on the one hand and the river return and canal on the other hand.

Except for the disputed channel, there is presently no water course between the main channel of the river and the area where the deer were killed.[10] In the past, there were other watercourses directly south of where the deer were killed. These watercourses lay between the main river channel and the disputed channel. Those watercourses are shown in aerial photographs taken in 1965 and 1939. However, they have now disappeared and are covered by trees and vegetation. Thus, at this time, there are only two watercourses directly south of the spot where the deer were killed.

In addition to constructing the Bennet dam on a yearly basis and maintaining the irrigation canal, the Midland Overland company annually maintains the disputed channel between the Bennet dam and the canal. For example, each spring, since approximately 1948, heavy equipment is operated in the channel to clear it of sediment and other debris. The disputed channel is much smaller in width than compared to the river. From the air, it also has a different appearance than the river.[11]

J. Michael Jess testified as an expert witness retained by the defense. For nearly 18 years, and until January of 1999, Jess was the Director of the Nebraska Department of Water Resources (DWR). Before that, he was deputy director of DWR for about six years. Among other

---

8. The Army Corps of Engineers, which has regulatory authority over the building of dams for certain purposes, has granted the Midland–Overland company permission to maintain sand diversion dams on the river. This permission is, however, subject to a wide variety of exceptions and qualifications.

9. Sometimes the dam is breached by the time irrigation season ends due to natural erosion caused by the river. Remnants of the dam may remain throughout the entire year.

10. The branch of the disputed channel that returns to the river (the river return) is east of the spot where the deer were killed.

11. A portion of a recent aerial photograph (Ex. 1) appears on the sketch attached to this opinion.

things, DWR is responsible for formulating Nebraska's water policy. It also regulates the diversion of water from rivers, including where, when and how such diversions may take place.

Jess holds both a bachelors and masters degree in civil engineering. He is a licensed professional engineer. As the Director of DWR, Jess was responsible for the regulation of all of Nebraska's rivers, including the North Platte River. He oversaw the regulation of diversions of water from the North Platte River by irrigation companies, including the Midland–Overland company. In this regard, he administered the Nebraska portion of North Platte River in accordance with a decree of the United States Supreme Court. *See, e.g., Nebraska v. Wyoming,* 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945). Everyone acknowledges that Jess is a preeminent authority on hydrologic, civil engineering and regulatory matters concerning the North Platte River.

Jess testified that the disputed channel, while once a channel of the river, had long ago ceased to be a part of it. It was his opinion that but for annual construction of the Bennet dam, and the associated maintenance of the channel by the Midland–Overland irrigation company, the disputed channel would have been blocked and filled by sediment. If that had happened, then the channel would have ceased to exist as a water course of any kind. Relying upon his training and experience, two opinions by the Nebraska Attorney General,[12] his investigation of the history of the Midland–Overland company, and onsite inspections both before and after the deer hunt in question, Jess testified that the disputed channel was not a channel of the North Platte River.

Jess stated that his opinion was not changed by the fact that the "point of diversion" for regulatory purposes was the "headgate" of the canal located on the eastern edge of the disputed channel rather than at the Bennet dam on the western end of that same channel.[13] Jess testified that the "point of diversion" for regulatory purposes could not define the "bank of the North Platte River" for the disputed channel because "Midland Overland had created something [—the disputed channel—] that is not natural. It is man-made."

Tom Hayden, a DWR field supervisor, testified that irrigation companies seek to place their "points of diversion" for regulatory purposes as close as possible to the irrigated fields for economic reasons. For example, if the Bennet dam was the "point of diversion," the Midland–Overland company would be required to account for water lost in transit from the "point of diversion" on the west to the corn fields on

**12.** Jess adopted the Nebraska Attorney General's definition of the words "banks" of the North Platte River. Jess testified, and it is undisputed, that "banks" of the North Platte River has twice been defined by the Attorney General, in reference to the Garden County refuge. In 1941, the Attorney General defined "banks," in reference to the Garden County refuge, to mean "that elevation of ground which confines the waters, holding the stream in *its natural course* in its ordinary state of high water." (Ex. 118, October 1, 1941 opinion (emphasis added).) In 1976, the Attorney General defined "banks," in the same context, to mean "that elevation of ground which confines the waters, holding the river in *its natural course* in its ordinary state of high water." (Ex. 120 at 3, September 29, 1976 opinion (emphasis added).) (There is an immaterial one-word difference between the 1941 and 1976 opinions: the 1941 opinion refers to "holding the *stream* in its natural course," and the 1976 opinion refers to "holding the *river* in its natural course.") Jess stressed that the words "natural course" of a river could not fairly apply to the disputed channel since that channel would have ceased to exist but for the maintenance activities of the Midland–Overland company.

**13.** "Point of diversion" can mean a variety of things. For example, the Bennet dam is clearly "a point of diversion" as those words are used in common parlance. When used by DWR it may also have a regulatory meaning, such as that "point at which the water under any water appropriation of record is diverted from a natural stream . . . ." Neb.Rev.Stat. § 46–250 (Michie 1995).

the east. Water is lost in transit because it is transported in channels located in porous sand. Each irrigation company has a finite amount of water that the State of Nebraska will allow it to use and transit losses count against that amount. Therefore, irrigation companies seek to avoid "points of diversion" that force the company to suffer large transit losses.

In 1950, the regulatory "point of diversion" for the Midland–Overland company was relocated, with the permission of DWR, to the present location on the eastern edge of the disputed channel. (Ex. 108.) Previously, the "point of diversion" had been located west of the disputed channel. (*Id.*) The order authorizing the change located the "point of diversion" as the "headgate of the Midland–Overland Canal ... *on the north bank of the North Platte River* ...." (*Id.* (emphasis added).)

Since the present "point of diversion" is on the eastern edge of the disputed channel, and it was referred to as being located "on the north bank of the North Platte River" in 1950, the government asserts that Jess' opinions are incorrect. In other words, the government suggests that if the headgate, east of the site where the deer were killed, is truly "on the north bank of the North Platte River" as DWR stated in 1950, then it follows that the disputed channel west of the headgate, at the point where the deer were killed, must also constitute the "north bank of the North Platte River" since both sites are on or adjacent to the same channel.

## B.

The Garden County Game Refuge came under the protection of Nebraska law in 1925. (Ex. 25, Sess. Laws, Ch. 107, No. 389 (April 1, 1925).) At that time the boundaries of the refuge were described this way: "All that portion of the state of Nebraska on the North Platte river and for ten rods on each side of the banks of said stream in Garden County, Nebraska." (*Id.* § 1.)

By 1941, there were "many land owners, hunters, and law enforcement officers" who had "divergent views" about the boundary of the refuge, and in particular the statutory language "banks of said stream." (Ex. 118, Opinion of Attorney General (October 1, 1941).) Accordingly, the local prosecutor asked for advice about the meaning of the words "banks of said stream."

The Attorney General noted that "some hold the view that the ten rods should be measured from the edge of the water even if there is only a trickle flowing in the bed of the stream...." (*Id.*) "[O]thers [hold the view] that it should be measured from the government survey of the banks of many years ago...." (*Id.*) "[S]till others [were of the opinion] that the measurement should begin at that elevation of ground touched by the river at its greatest known flood stage." (*Id.*)

The Attorney General rejected each of these interpretations. He stated that the proper definition was the following: "The bank of a river is that elevation of ground which confines the waters, holding the stream in its natural course in its ordinary state of high water." (*Id.*)

In 1947 the Nebraska legislature recognized that longer range hunting weapons were being developed, and the 10 rod buffer zone around the refuge was insufficient. (Ex. 25, Minutes of the Agricultural Committee of the Nebraska Legislature at 1 (March 3, 1947).) A representative from the predecessor of the Nebraska Game and Parks Commission stated that "if the new magnum shot gun comes into common use featuring a longer shot range, it would be desirable to have the greater distance [20 rods] as the boundary limit." (*Id.*) Accordingly, the statute was amended to insert the 20 rod buffer zone around the refuge. *See* Neb.Rev.Stat. § 37–412 (Michie 1995) (historical note indicating that the 1947 amendments derived from Laws 1947, c. 135, § 1, p. 379).

In 1965 the Nebraska legislature recognized that: "In some places dikes have

been built to narrow the river, and by so doing, the bird refuge [in Garden County] has been narrowed." (Ex. 25, LB 449, Introducer's Statement of Intent (April 9, 1965).) A bill was introduced that "prevents future man-made alterations to change the boundaries of the bird refuge." (*Id.*) This legislation, however, ran into trouble.

Noting that "[f]our more dams have been put in along the North Platte River," Farley Young, an opponent of the bill, proposed that the "future alterations" provision be amended. (*Id.*, Minutes of Committee Hearing on LB 449 at 4 (April 9, 1965).) Mr. Young proposed that the words "except the repair of existing alterations" be inserted to modify "future alterations." (*Id.*) This amendment, with very minor changes, was accepted by the committee considering the bill. (*Id.*, Committee Statement on LB 449 at 1–2 (May 5, 1965).)

Accordingly, the statute was amended substantially as proposed by the Farley Young amendment. (*Id.*, LB 449, § 1 (June 30, 1965).) The statute, as amended, reads as follows: "All that portion of the State of Nebraska on the North Platte River and for twenty rods back of the banks of said stream on the land side in Garden County, *Nebraska, and, except for the repair for existing alterations, future alterations in the banks by the damming of such streams shall not be recognized as effecting legal changes of such refuge boundary.*" (*Id.* (emphasis added to reflect 1965 amendment).)

Despite the 1965 amendment, uncertainty about the boundary of the refuge continued. In 1976 the Garden County Attorney asked the Nebraska Attorney General for an opinion on a variety of questions regarding the "bank" of the river. One question asked: "If the water in a stream results from a dike on the river channel placed there by an irrigation district, must the hunting pit be located 20 rods from the

bank of the stream used by the irrigation company?" (Ex. 120, Opinion of Nebraska Attorney General (Sept. 29, 1976).)

The Nebraska Attorney General, relying upon the 1941 opinion (Ex. 118), adopted the definition used in the earlier opinion; that is, "the bank of the North Platte river is that elevation of ground which confines the waters, holding the river in its natural course in its ordinary state of high water." (Ex. 120, Opinion of Nebraska Attorney General at 3.) [14] Moreover, the Attorney General also recognized that the purpose of the 1965 amendment "was to prevent future man-made alterations, as opposed to flooding and other natural causes, from changing the boundaries of the refuge." (*Id.*)

According to the Attorney General, "banks should not be considered as the boundary lines of the extreme limits of the flood stage of the river." (*Id.*) In the same vein, but at the opposite end of the spectrum, whether "the stream has water" at any given time "would appear to be irrelevant." (*Id.*) The Attorney General then addressed the question: "If the water in a stream results from a dike on the river channel placed there by an irrigation district, must the hunting pit be located 20 rods from the bank of the stream used by the irrigation company?" (*Id.* at 1.)

The Attorney General stated that the answer "appears to turn upon whether the particular dike is an 'existing alteration' under section 37–412." (*Id.* at 4.) According to the Attorney General, "[a]n existing alteration would be one present before November 15, 1965, the effective date of L.B. 449, Laws 1965." (*Id.*) Accordingly, "[a]ny change in the river bank caused by a dike or other man-made alteration constructed after November 15, 1965, does not affect the refuge boundaries." (*Id.* at 2.)

The controversy continued. In 1981, the local prosecutor brought a misdemeanor criminal case against Clarence Avis (the Avis case) alleging that Avis had unlawful-

**14.** *See supra* note 12.

ly carried a gun in the Garden County Refuge. (Ex. 38).[15] For the purposes of Wheeler's case, everyone agrees that Avis carried a gun within 20 rods of the disputed channel. In other words, the Avis case is like this one in the sense that the hunting activity took place within 20 rods of the disputed channel.

The Avis matter was tried to a county court judge. Avis was found guilty, and he was fined $100. The judge issued a "journal entry." (*Id.*, Journal (March 4, 1981).) Without explanation, the judge concluded "that the land in question lies within the confines of the Garden County Game Refuge as described in Section 37–412 ... and therefore finds the Defendant, Clarence Avis, guilty as charged." (*Id.*)

On appeal to the district court, the decision was affirmed. (*Id.*, Order (January 6, 1982).) The judge stated in his one page order that "the only issue presented is whether or not the lands upon which defendant-appellant admittedly carried a firearm were within the limits of the Garden County, Nebraska Game Refuge as designated in section 37–412...." (*Id.*) The district judge concluded that "the evidence supports the finding of the Garden County Court on that issue." (*Id.*) There was no further appeal.

Nebraska district courts are courts of general jurisdiction, and they are the primary trial courts in the state. *See* Neb. Rev.Stat. § 24–302 (Michie 1995). They also possess appellate jurisdiction over county court misdemeanor cases. Neb. Rev.Stat. § 25–2728 (Michie 1995). However, only the Nebraska Supreme Court can issue, or authorize the issuance of, opinions having value as precedent that are binding upon other courts. *See Metro Renovation Inc. v. State of Nebraska De-*

*partment of Labor,* 249 Neb. 337, 343, 543 N.W.2d 715, 721 (1996) (per curiam) (opinions of the then recently created Court of Appeals do not constitute binding precedent that must be followed by the district and county courts). *See also* Neb.R.Prac. & Proc. in S.Ct. & Ct.App. 2E (West 1999) (authorizing the Nebraska Court of Appeals to create precedent under certain circumstances).

## II. DISCUSSION

When the relevant Nebraska statute[16] uses the words "banks of said stream" as the measuring point for a game refuge boundary, do the words encompass, as the government argues, a river channel that remains open only because of the long standing use and maintenance of that channel by an irrigation company? Or, as suggested by the defendant, do the words "banks of said stream" refer to a stream in its natural course?

### A.

■ "Ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity [leniency]." *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (applying the rule in favor of a criminal defendant; concluding that the words "in commerce or affecting commerce" meant that the government must prove a connection with interstate commerce in each case where a felon was alleged to be in possession of a firearm and not only where a felon was alleged to have transported a firearm) (quoting *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)). "This principle is founded upon two policies that have long been part of our tradition." *Id.* at 348, 92 S.Ct. 515.

---

**15.** The trial transcript and much of the court file have been located by the parties and received in evidence in this case. The exhibits received in evidence in the Avis case have been lost.

**16.** "All that portion of the State of Nebraska on the North Platte River and for twenty rods back of the banks of said stream on the land side in Garden County, Nebraska, and, except for the repair for existing alterations, future alterations in the banks by the damming of such streams shall not be recognized as effecting legal changes of such refuge boundary." Neb.Rev.Stat. § 37–412 (Michie 1995).

The first policy underlying the rule of lenity relates to "'fair warning.'" *Id.* (citation ·omitted). In other words, people should be able to ascertain what conduct is criminal so that they may conform their behavior accordingly. Secondly, "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.* Thus, the rule of lenity requires legislatures to speak clearly so that they make the law rather than the courts.

I have carefully applied the facts to the text, structure, and history of the statute. In addition, I have sought out all other available interpretative materials. But, after "'seizing everything from which aid can be derived,' [I] can make 'no more than a guess as to what [the Nebraska legislature] intended'." *United States v. Wells,* 519 U.S. 482, 117 S.Ct. 921, 931, 137 L.Ed.2d 107 (1997) (materiality found not to be an element of the crime consisting of knowingly making any false statement or report for the purpose of influencing the action of a federal insured bank) (quoting *Reno ,v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 2029, 132 L.Ed.2d 46 (1995) (in turn quoting *Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), and *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958))).

▪ Accordingly, since the "Government's position is [not] unambiguously correct[,]" I must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson,* 511 U.S. 39, 54–55, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (affirming release of defendant and interpreting the phrase "original sentence" in favor of the defendant in a probation revocation case). *See, e.g., United States v. Smith,* 35 F.3d 344, 346 (8th Cir.1994) (Bowman, J.) (applying rule of lenity in favor of a defendant invoking a statute that provided· a defense for the recantation of false testimony; the term "or," which was used in the statute, when compared with the term "and," which was not in the statute, meant something different from "and;" to take advantage of the defense, the defendant was only required to prove one element rather than two).

Thus, for the purposes of this felony case, I construe the words "banks of said stream" to mean a "stream in its natural course." I decide that those words do not encompass a river channel that remains open only because of the use and maintenance of that channel by an irrigation company over the past half-century. When the statute is so construed, Wheeler's conduct was lawful. Simply put, the boundary of the game refuge, when measured from the main channel of the river, as opposed to the disputed channel, as required by the rule of lenity, does not include the area where Wheeler guided the hunt.

### B.

It is helpful to set forth the reasons for my decision in slightly more detail. I do so next.

·First, while the disputed channel was once a channel of the North Platte River, there is no doubt that it now exists only because of the continuous use and maintenance of the channel by the irrigation company. It is undisputed that the irrigation company has, for more than 50 years, constructed and reconstructed the Bennet dam to force water into the disputed channel. Since 1948, the company has run heavy equipment up and down the channel each year to keep it open.

Still further, Mike Jess, the only person who testified and who was qualified to speak on the subject, stated that the disputed channel would have disappeared long ago but for the work of the irrigation company. Jess' testimony is corroborated by a comparison of the present day aerial photograph (Ex. 1) with the 1939 (Ex. 12) and 1965 (Ex. 13) photographs. This comparison clearly reveals that nearby chan-

nels, pictured in the 1939 and 1965 photos, which were not used and maintained by man have disappeared as the river moved south and east. In short, the disputed channel remains in existence today solely because of the efforts of man. In no sense can water in the disputed channel be considered the river in its natural course.

Second, there is also no doubt that the statute is ambiguous. As the 1941 opinion of the Attorney General suggests, "banks of said stream" might mean "the edge of the water even if there is only a trickle flowing in the bed of the stream," or it might mean "the government survey of the banks of many years ago," or it might mean that "elevation of ground touched by the river at its greatest known flood stage." (Ex. 118.) [17]

Furthermore, in 1976, the Attorney General recognized that the meaning of the words "banks of said stream," when applied to a case involving man-made change in the river bank, must be viewed in the context of "whether the particular dike is an 'existing alteration' under section 37–412." (Ex. 120 at 4 (commenting on 1965 amendment).) [18] According to the Attorney General, if the "banks of said stream" are altered by a man-made structure existing prior to 1965, the boundary of the river must be judged according to the change caused by that "existing alteration" and "repairs" thereto. (*Id.*)

In this regard, the need to ascertain whether a particular "dike" is an "existing alteration" creates an additional ambiguity. It is unclear what the legislature specifically intended when it "grandfathered" changes to the bank of the river resulting from "existing alterations" or "repairs" thereto. For example, does an "existing alteration" or related "repair" pertain only

to a structure like a concrete dam, or do the words pertain to a sand dam, like the Bennet dam, rebuilt every year since 1948? Still further, does an "existing alteration" or "repair" thereto pertain only to a concrete canal, or do those words pertain to an earthen channel that is "bulldozed" every year for more than 50 years?

Third, from a general definition standpoint, the defendant's position is a plausible reading of "banks of said stream." The Nebraska Attorney General has twice stated that "banks of said stream" means: "that elevation of ground which confines the waters, holding *the stream [river] in its natural course* in its ordinary state of high water." (Ex. 118 (emphasis added); Ex. 120 at 3 (emphasis added).) [19] In this case, the channel would not exist but for the work of man. In no sense can the disputed channel be considered the river "in its *natural course*" since without man there would be no channel.

Fourth, from the standpoint of the 1965 amendment to the statute, the defendant's position is plausible as well. In 1965 the Nebraska legislature recognized that man-made changes to the river bank could shrink and were shrinking the boundaries of the refuge. It is also clear that supporters of the refuge wanted to reverse that trend, but another faction sought to blunt the efforts of the refuge supporters. This dispute was resolved by the Farley Young amendment.

The Young amendment essentially stated that alterations to the river bank causing refuge boundary line changes would be recognized if the alterations commenced prior to the 1965 effective date. Since the Bennet dam and associated maintenance of the disputed channel were constructed or

---

**17.** It is worth noting that as early as 1941 there were "many land owners, hunters, and law enforcement officers" who had "divergent views" about the boundary of the refuge.

**18.** The amendment provided that "except for the repair for existing alterations, future alterations in the banks by the damming of such streams shall not be recognized as effecting

legal changes of such refuge boundary." Neb.Rev.Stat. § 37–412 (Michie 1995). The words "except for the repair for existing alterations" were added at the request of Farley Young.

**19.** *See supra* note 12.

started long before 1965 and since the disputed channel would not exist but for that continued work, the defendant can plausibly argue that the statute *explicitly* contemplates an exception for pre–1965 man-maintained channels like the one at issue.

Fifth, I am not persuaded that Neb.Rev. Stat. § 37–412 is any less ambiguous because the "regulatory point of diversion" is located at the headgate east of the disputed channel. Initially, I note that the "regulatory point of diversion" was west of the disputed channel for a long time prior to 1948, and it was probably moved for purely economic reasons. I do not think it sensible to conclude that the Nebraska legislature intended to give DWR and irrigation companies alike the power to alter the boundary of a refuge by moving diversion points pursuant to a statute that has nothing to do with the sanctuary statute.

More to the point, neither the game refuge statute nor the Nebraska Attorney General in his opinions on the subject make any mention of "point of diversion," regulatory or otherwise, regarding the words "banks of said stream." Nor has the Nebraska legislature or any state agency, through a properly promulgated regulation, sought to define "banks of said stream" by reference to a "point of diversion." While I have considered the regulatory point of diversion, I find that it provides little help in understanding the pertinent statute.

Sixth, while I have considered the Avis case, I am not persuaded by it. Initially, the case has no value as precedent under Nebraska law. Furthermore, the case contains no reasoning, and I therefore have no ability to judge the strength of the court's conclusions. Finally, I have read the transcript of testimony presented to the court, and it contains no testimony from a competent hydrologist and civil engineer like Mr. Jess. Thus, the Avis court was not confronted with the same quality of evidence presented in this case. It is wise to be skeptical of a decision in a misdemeanor case premised on a weak record when that decision is used by the government to support a felony conviction.

Seventh, I am not persuaded by the government's reliance upon *Northport Irrigation Dist. v. Jess*, 215 Neb. 152, 337 N.W.2d 733 (1983).[20] In that case the Northport Irrigation District sought to "double-dip." Using one permit, it brought water into an area for irrigation via a canal that was separate from the Upper Dugout Creek. The water was then supplied to the crops, and percolated into the ground. The ground water then fed the Upper Dugout Creek. After that, the irrigation district pumped the water out of the creek without a water right.

The Supreme Court upheld Mr. Jess' ruling that enjoined the irrigation district from pumping water out of the creek without a permit. In the course of ruling on that question, the Nebraska Supreme Court stated that the Upper Dugout Creek did not lose its natural character because "a portion of the banks of the Upper Dugout Creek had been repaired." *Id.,* 215 Neb. at 156–57, 337 N.W.2d at 737. In the words of the court, "[a] natural stream or watercourse does not lose its natural character as such merely by artificial improvements." *Id.*[21]

The *Northport* case does not help the government. To start with, it did not deal with the pertinent statute, and it therefore provides no direct guidance. Further-

---

**20.** The "Jess" who is the prevailing party in *Northport* is the same person who testified for the defense in this case. The government asked Jess no questions about the *Northport* decision during the trial of this case.

**21.** The court's discussion on this point takes up two sentences. The majority of the opinion dealt with the interrelationship of ground and surface water. The main question in *Northport* was whether water that ran in a creek was public water even though part of the flow may come from groundwater under private land.

more, the *Northport* court was not required to confront the 1965 amendment to Neb.Rev.Stat. § 37–412. The 1965 amendment contemplated that artificial improvements, like dams, *could* change the boundary of the refuge. Thus, whatever interpretative aid *Northport* might provide in other contexts, it provides no assistance in this one. Finally, *Northport* deals only with "repairs" to a "portion" of the creek. The *Northport* facts are much different than the facts presented in this case.

Here, Mr. Jess, the prevailing party in *Northport*, testified, without contradiction, that the *entirety* of the disputed channel remains in existence *solely* because of the efforts of man. The channel would have disappeared had the irrigation company not intervened.

Accordingly,

IT IS ORDERED that judgment shall be entered for the defendant finding him not guilty.

ATTACHMENT

NORTH

Deer

East End of Disputed Channel and Headgate of Canal

Return to River

Sand Dam for River Return

N.P. River

Disputed Channel

West End of Disputed Channel and Bennet Sand Dam

N.P. River

N.P. River

N.P. River

JUDGE'S SKETCH
UNITED STATES V. WHEELER