753 N.W.2d 345 (2008)
276 Neb. 215
Gary C. SCOFIELD and Joyce E. Scofield, appellants,
v.
STATE of Nebraska, DEPARTMENT OF NATURAL RESOURCES, et al., appellees.
No. S-07-511.
Supreme Court of Nebraska.
July 25, 2008.
*348 Allan J. Eurek & Associates, P.C., Lincoln, for appellants.
*349 Jon Bruning, Attorney General, and Katherine J. Spohn for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.
Gary C. Scofield and Joyce E. Scofield sued the Department of Natural Resources (DNR) and other state officials, alleging that in establishing the boundaries for a state game refuge, the DNR exceeded its statutory authority, deprived them of their constitutional right to due process, and effected a taking of their property without just compensation. The Scofields' complaint was dismissed for failure to state a claim upon which relief could be granted. On appeal, we must determine whether the DNR's establishment of the refuge boundaries complied with the relevant statutes and whether the Scofields have stated any claims upon which relief may be granted.

STATEMENT OF FACTS
The Legislature, pursuant to Neb.Rev. Stat. § 37-707(2)(a) (Reissue 2004), gave the DNR the authority to promulgate rules and regulations establishing the boundaries for the state game refuges. Land that is designated as a state game refuge has certain restrictions placed upon it. These restrictions include, among other things, a prohibition on hunting game birds, game animals, or other birds or animals within the boundaries of the refuge.[1]
The DNR's determination of the boundaries is governed by the definitions in Neb. Rev.Stat. §§ 37-701 to 37-708 (Reissue 2004). Section 37-706(1) directs that a state game refuge be established on "[a]ll that portion of the State of Nebraska on the North Platte River and for one hundred ten yards back of the banks of said stream on the land side in Garden County, Nebraska." Section 37-706(3) provides that "the banks of said stream means the banks of the river which are the elevation of ground which confines the water at a level not exceeding flood stage."
On April 25, 2005, the DNR adopted the "Rules Relating to Boundary of State Game RefugeGarden County, Nebraska," which rules are codified as title 459, chapter 1, of the Nebraska Administrative Code (regulations). These regulations determined the boundaries of the Garden County game refuge. As relevant to this case, the regulations used the Midland-Overland Canal (Canal) to establish a part of the boundary.
The Scofields, residents of Keith County, filed a complaint in the Lancaster County District Court against the DNR and various other state officials (hereinafter collectively the DNR). They allege that both the North Platte River and the Canal pass through property they own in Garden County. They allege that the "Canal is an irrigation ditch which historically has been privately and regularly maintained as a ditch for the delivery of irrigation water" and "is not a channel of the North Platte River," nor do its banks "constitute the banks of the North Platte River." The Scofields further allege that by the DNR's using the banks of the Canal to establish the boundary, approximately 53 acres of accretion ground on their property has been designated as part of the Garden County refuge that would not have been had the bank of the North Platte River been used as the boundary.
Given these factual allegations, the Scofields set forth five claims for relief that *350 can be consolidated into three. First, the Scofields assert that the regulations, to the extent they use the Canal to establish the boundary for the refuge, should be declared invalid because the regulations were adopted in violation of the Nebraska and federal Constitutions and exceeded the DNR's statutory authority. With regard to their first claim for relief, the Scofields also allege that the use of the Canal to establish a boundary for the refuge is "contrary to prior legal precedent," in particular, U.S. v. Wheeler,[2] an opinion of the U.S. District Court for the District of Nebraska.
Second, the Scofields assert that under the Nebraska and federal Constitutions, their due process rights have been violated. Specifically, they allege that the regulations "are so egregious and irrational as to exceed standards of inadvertence and mere errors of law, and do not substantially advance a legitimate state purpose" and therefore "constitute a deprivation of [their] due process rights."
Third, the Scofields claim that the regulations resulted in an unlawful taking of their property without just compensation under the Nebraska and federal Constitutions. Regarding this claim, the Scofields allege that the regulations "have resulted in substantial damages." They further allege that the regulations have "significantly denied [them] their enjoyment and beneficial (or economically viable) use of a portion of [their] [p]roperty," have "precluded the viability and use of the property for reasonable hunting purposes," have "deprived [them] of recreational income," and have "resulted in a diminishment of the fair market value of such property."

ADDITIONAL INFORMATION REGARDING CANAL
In their brief, the Scofields clarify that the Canal at issue in this case begins at the point where the Wilkinson Diversion Dam diverts water from the North Platte River into the Canal. The Canal carries the water downstream until it reaches the Bennet Sand Dam. The Bennet Sand Dam then diverts some of the water from the Canal into a separate irrigation channel, while the water that was not diverted remains in the Canal and returns to the North Platte River. The Scofields' property is located between the Wilkinson Diversion Dam and the Bennet Sand Dam. For the reader's assistance, we have prepared a diagram depicting the North Platte River, the Scofields' property, and other features relevant to this appeal. The diagram is for illustrative purposes only and does not purport to be to scale.
*351 
As previously noted, the Scofields, in their complaint, referenced the case of U.S. v. Wheeler,[3] which, like the present case, involved a question relating to the location of the boundaries of the Garden County refuge. However, although dealing with the same general area, the specific boundary at issue in Wheeler is not the same section of the Canal that is at issue in the present case. The question in Wheeler involved the boundary along what the Wheeler court termed the "disputed channel."[4] The disputed channel in Wheeler was the separate irrigation channel that is formed when some of the water from the Canal is diverted by the Bennet Sand Dam. And, as will be explained below, the legal definition of the refuge's boundary has been amended since Wheeler. But while the boundary dispute in Wheeler was different from the one at issue here, the Wheeler court's description of the area provides some helpful context for the current dispute.
As the Wheeler court explained, in the relevant area, the North Platte River generally flows south and east. The river has various channels, and it has a sandy bottom. The location of the numerous banks of the river change over time. New river channels are constantly being made by the course of the river, and old channels are filled by sediment deposits. When that occurs, the old channel no longer carries river water.
Several irrigation companies divert water from the river, including the Midland-Overland irrigation company. The water ran into the "disputed channel" in Wheeler due to the obstruction caused by the Bennet Sand Dam. However, not all the water in the Canal is diverted by the Bennet Sand Dam. The Canal and the remaining water continue to the south and east at the Bennet Sand Dam, while the "disputed channel" runs in a more easterly direction. In the fall, the Bennet Sand Dam is breached by the Midland-Overland irrigation company. Most of the water then flows in the Canal as opposed to flowing into the disputed channel.
The waterway at issue in this case is the portion of the Canal upstream from the Bennet Sand Dam. In short, the water flowing through the waterway disputed in *352 this case is diverted from the river at the Wilkinson Diversion Dam, through the Canal past the Scofields' property, and then to the Bennet Sand Dam, where it either is diverted into the "disputed channel" discussed in the Wheeler case, or stays in the Canal and returns to the river.

DISTRICT COURT'S DECISION
In response to the Scofields' complaint, the DNR filed a motion to dismiss, claiming that the Scofields' complaint failed to state a claim upon which relief could be granted.[5] The district court granted the DNR's motion. The court disagreed with the Scofields' claim that the use of the Canal to establish the boundary for the refuge was contrary to the DNR's statutory authority. The court explained that it had already determined in a consolidated order in two other cases that the DNR had "properly utilized the statutory definitions detailed in Neb.Rev.Stat. § 37-706 in determining the boundaries of the Garden County Refuge."
The court then pointed to the language of the consolidated order in which it had held that
"the Legislature gave the authority to the DNR to create the boundaries through the use of maps and global positioning technology. In accordance with Neb.Rev.Stat. § 37-07(2)(a), the DNR promulgated boundaries of the Garden County Refuge `based' on the definitions of § 37-706. The DNR's adoption of [the Garden County Regulations] was based on the plain and ordinary reading of § 37-706 and the DNR was acting with constitutional authority granted by the Legislature."
The court concluded that nothing in the DNR's determination was contrary to the statutory definition of the Garden County refuge found in § 37-706 or the authority granted to the DNR in § 37-707(2).
The district court also dismissed the Scofields' claims that the regulations violated their substantive due process rights and constituted an unlawful taking of their property without just compensation. In so doing, the court cited Bauer v. State Game, Forestation and Parks Commission[6] and explained that the Scofields have no property right in the wildlife that enters their land. Accordingly, the court determined that because the Scofields do not have a right to the wildlife on their property, "the prohibition of hunting on their property does not result in a Due Process Clause violation," nor does it result in an unconstitutional taking. Thus, all of the Scofields' claims for relief were dismissed, and the Scofields appealed.

ASSIGNMENTS OF ERROR
The Scofields assert, summarized, restated, and renumbered, that the district court erred in (1) finding that the regulations were valid under Neb.Rev.Stat. §§ 37-708.01 (Reissue 2004) and 84-911(2) (Reissue 1999), (2) dismissing their substantive due process claims, (3) dismissing their claims that the regulations constituted an unlawful taking, and (4) giving preclusive effect to factual determinations made by the court in two consolidated cases, both previously dismissed on the State's motion for summary judgment.

STANDARD OF REVIEW
[1,2] An appellate court reviews de novo a lower court's dismissal of a complaint for failure to state a claim.[7] When *353 analyzing a lower court's dismissal of a complaint for failure to state a claim, an appellate court accepts the complaint's factual allegations as true and construes them in the light most favorable to the plaintiff.[8]
[3] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.[9]

ANALYSIS
REGULATIONS ESTABLISHING BOUNDARY ARE VALID
[4] The Scofields contend that the DNR exceeded its statutory authority in promulgating the regulations that utilized the Canal to establish the boundary for the refuge, and therefore, the regulations should be declared invalid. The DNR disagrees, arguing that the Legislature expressly gave it the authority to set the boundary and that it has acted within its statutory authority.
The Legislature has given the DNR the authority to determine the boundaries of the state game refuges, within broad parameters set forth in the statutes.[10] The parameters for the Garden County refuge are "[a]ll that portion of the State of Nebraska on the North Platte River and for one hundred ten yards back of the banks of said stream on the land side in Garden County, Nebraska."[11] But the Legislature's sole guidance to the DNR regarding the "banks" of the North Platte River is that they are "the banks of the river which are the elevation of ground which confines the water at a level not exceeding flood stage."[12] The parties' difference of opinion regarding the DNR's establishment of the Canal as part of the refuge boundary is explained by the fact that the Legislature did not expressly instruct the DNR on whether the "banks of the river" should include man-made waterways.
The legislative history of § 37-706 suggests that this omission was intentional. Between 1965 and 2004, the refuge's boundary had specified that "except for the repair for existing alterations, future alterations in the banks by the damming of [the North Platte River] shall not be recognized as effecting legal changes of such refuge boundary."[13] 2004 Neb. Laws, L.B. 826, was introduced because the refuge boundary was "most in need of clarification since litigation surrounding the refuge has been abundant in the past few years."[14]
As originally proposed, L.B. 826 would have defined the "banks of the river" as "the elevation of ground which confines the water in its natural course."[15] But as the introducer of the bill explained:
The real issue that we have in western Nebraska, more so than eastern Nebraska, is that whenever you look at the flow of rivers or streams through western Nebraska ... like in the North Platte River, that channel, it's more of a braided stream. It's not channelized *354 like you would have in eastern Nebraska.[16]
And as a representative of the Attorney General's office explained, in describing the litigation that prompted the bill, the law provided that man-made changes after 1965 had to be excluded, "but how can you now 30 years later determine what course the river would have taken if you didn't have man-made intervention?"[17]
The Attorney General's representative explained that in order to have effective legal enforcement of the refuge boundaries, it would be helpful to "move the setting of the boundary into a rule-making process in which the [DNR] would set those boundaries."[18] Therefore, the representative recommended that the language referring to "natural course" be removed because it was not enforceable.[19] Instead, the boundary would be determined by the DNR, and "if that encompasses some of the man-made intervention, then so be it."[20] And based on that testimony, the bill was amended to enact § 37-706 (Reissue 2004) in substantially its current form.[21] In short, the purpose of the amendment, and of the amended bill, was to "give the authority to the [DNR] to determine the banks of the river" without specifying whether they included man-made waterways.[22]
[5-8] It is a well-established principle that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the policy of a statute.[23] An administrative agency is limited in its rulemaking authority to powers granted to the agency by the statutes which it is to administer, and it may not employ its rulemaking power to modify, alter, or enlarge portions of its enabling statute.[24] But in considering the validity of regulations, we generally presume that legislative or rulemaking bodies, in enacting ordinances or rules, acted within their authority, and the burden rests on those who challenge their validity.[25] And in particular, we have said that delegation of legislative power is most commonly indicated where the subject to be regulated is highly technical or where regulation requires a course of continuous decision.[26]
[9] Section 37-706 is silent on whether man-made waterways, as the Canal is alleged to be, should be included in the "banks of the river." But when a statutory term is reasonably considered ambiguous, a court may examine the legislative history of the act in question to ascertain the intent of the Legislature.[27] Here, *355 when read in context, it is evident that the Legislature did not intend § 37-706 to either include or exclude man-made waterways from the "banks of the river." Instead, the Legislature intended to delegate to the DNR the responsibility for determining whether any particular waterway should be considered part of the banks of the river.
For this reason, we reject the Scofields' claim that the DNR exceeded its statutory authority in using the Canal as part of the refuge boundaries. While the definition of the "banks" of the North Platte River set forth in § 37-706(3) does not necessarily include man-made waterways, it does not exclude them either. Instead, the Legislature has entrusted the DNR with the authority to make those determinations. And there is no allegation in the Scofields' complaint that the Legislature's delegation of authority was unlawful.
To be sure, the DNR's authority to establish the boundaries of the state game refuges is not unlimited. The Legislature has provided reasonable limitations and standards to the DNR for carrying out its delegated duties,[28] and the DNR must act within them. And by concluding that the regulations in the present case are valid, we do not foreclose the possibility that under other circumstances, the DNR's determination of a particular boundary may exceed its statutory authority. But the complicated history and geography of the waterway at issue in this case demonstrate precisely why the Legislature found itself ill equipped to establish a one-size-fits-all definition of the boundary of the refuge. This court is at least equally ill suited to make such a determination. Instead, § 37-706 allows the DNR to decide such matters, as the administrative agency best prepared to do so.
And in the present case, the DNR's adoption of the regulations establishing the Canal as the boundary for the refuge was a reasonable exercise of the DNR's authority as granted by the statute. As explained in Wheeler,[29] which the Scofields relied upon in their complaint,[30] water from the North Platte River flows through the Canal and back into the main channel of the river. And more importantly, regardless of whether the Canal was man-made or is maintained, the Scofields do not allege any facts that would carry their burden of showing that the DNR acted unreasonably in concluding that the Canal should now be considered part of the banks of the North Platte River for these purposes.
The DNR's official rulemaking record[31] provides some context for the DNR's decision to use the Canal to establish the refuge boundary. The DNR was presented with substantial evidence suggesting that the Canal was not a "natural" part of the river, such that the Canal would run dry if a man-made impediment, the Wilkerson Diversion Dam, was not maintained each irrigation season.[32] But the DNR recognized, correctly, that L.B. 826 "deleted *356 a requirement in prior law that prohibited the consideration of man-made alterations as affecting legal changes or refuge boundaries."[33] The head of the DNR's survey division explained the lengthy and detailed process used by the DNR to establish the refuge boundaries. He described the use of manned surveys and aerial photographs "to make sure that the river geometry had not changed significantly" in a 10-year period.[34] The riverbank locations derived from aerial photographs were reviewed by DNR field office personnel and "were determined to be consistent with near, bank-full river conditions."[35] And those determinations were also compared to National Weather Service information to confirm that they reflected water levels "not exceeding flood stage."[36]
The process described in the official rulemaking record reflects a reasonable implementation of the standard established by § 37-706(3). The refuge was created "[f]or the better protection of birds and the establishment of breeding places therefor ..."[37] Wild birds are, presumably, not concerned with whether a waterway is maintained by human intervention. Given the purpose of the refuge, the "natural" course of the river is less important than the actual course of the river, regardless of the reason it follows that course. And the DNR's survey personnel gathered data and engaged in a rigorous process of analysis to determine where the actual course of the river was located, over the 10-year period preceding the establishment of the disputed boundary. In short, the official rulemaking record reflects that the DNR exercised the authority delegated to it in a manner consistent with the controlling statutes and the purpose of those statutes.
The Scofields' complaint does not allege facts that, if proved, would be sufficient to carry their burden of showing that the DNR acted unreasonably, or outside the authority delegated to it by the Legislature, when it used the Canal to establish the boundary of the refuge. Accordingly, the district court did not err in dismissing the Scofields' first claim for relief.

SUBSTANTIVE DUE PROCESS CLAIMS
The Scofields also contend that the district court erred in dismissing their claim that the DNR's decision violated their substantive due process rights under the federal and Nebraska Constitutions.
[10] The federal and Nebraska Constitutions contain similar due process language, and both provide that no person shall be deprived of life, liberty, or property without due process of law.[38] Because the due process requirements of Nebraska's Constitution are similar to those of the federal Constitution, we apply the same analysis to the Scofields' state and federal constitutional claims.[39]
The Scofields first claim that their substantive due process rights have been violated because the regulations at issue "go too far," thus destroying the value of their property to such an extent that the regulations have the same effect as a taking by eminent domain. In presenting this claim, the Scofields are apparently relying on *357 language found in this court's decision in Whitehead Oil Co. v. City of Lincoln.[40] In Whitehead Oil Co., we cited the 11th Circuit case of Eide v. Sarasota County,[41] which identified various types of challenges a landowner could bring against the State. The 11th Circuit in Eide characterized one of these challenges as a "due process takings" claim,[42] which apparently is what the Scofields are asserting here. The court in Eide explained that this type of claim can be brought by the plaintiff when "the application of the regulation goes so far and destroys the value of his or her property to such an extent that it has the same effect as a taking by eminent domain."[43]
However, after our decision in Whitehead Oil Co., and approximately 7 years after deciding Eide, the 11th Circuit, in Villas of Lake Jackson, Ltd. v. Leon County,[44] concluded that two U.S. Supreme Court cases, First Lutheran Church v. Los Angeles County[45] and Lucas v. South Carolina Coastal Council,[46] refuted the notion of due process as an independent ground for a takings claim. The 11th Circuit concluded that those U.S. Supreme Court cases, when read together, "firmly place all the constitutional constraints on regulatory takings recognized by this Court under the Takings Clause alone."[47] The court definitively stated, "There is no independent `substantive due process taking' cause of action. The only substantive due process claim is for arbitrary and capricious conduct."[48] Stated differently, the court determined that the only available substantive due process claim in this context is one that alleges that the regulation is arbitrary and capricious.
[11] We agree with the 11th Circuit's analysis and conclusion in this regard. Accordingly, we now conclude that when a party alleges that a regulation "goes too far," as the Scofields have done here, such a claim should be analyzed under the Takings Clause of the Fifth Amendment and not under principles of substantive due process. To the extent Whitehead Oil Co. can be read as creating a "due process takings" claim, it is disapproved. Accordingly, the district court properly dismissed the Scofields' claim that their substantive due process rights were violated because the regulations "go too far."
[12,13] The Scofields also allege that their substantive due process rights have been violated because the regulations, insofar as they use the Canal to establish the boundary for the refuge, are arbitrary, capricious, and not based on any legitimate state interest. To establish a substantive due process violation, the government's land-use regulation must be "`"clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."'"[49]
*358 Because the Scofields' substantive due process claim was dismissed for failure to state a claim, the key inquiry in our analysis is simply whether the facts, as pled in the Scofields' complaint, sufficiently allege an arbitrary and capricious act. The Scofields argue that they have met this standard. In particular, the Scofields point to their complaint wherein they allege that the regulations, "to the extent they utilize the shoreline banks of the [Canal] to establish the boundaries of the ... Refuge, are arbitrary and capricious, are so egregious and irrational as to exceed standards of inadvertence and mere errors of law, and do not substantially advance a legitimate state purpose."
[14] But this assertion by the Scofields is merely a legal conclusion, and we are free to ignore sweeping legal conclusions that are cast in the form of factual allegations.[50] More to the point, as already discussed above, the regulations using the Canal to establish the refuge boundary are consistent with the applicable statutory requirements.
Because we have already determined that the regulations using the Canal to establish the refuge boundary are consistent with the applicable statutes, and because the Scofields do not take issue with the statutes themselves, the Scofields cannot prove a set of facts in support of their substantive due process claims that would entitle them to relief. Therefore, the district court did not err in dismissing their substantive due process claim.

UNLAWFUL TAKING WITHOUT JUST COMPENSATION
[15] The Scofields next argue that the district court erred in dismissing their claim that the regulations effected an unlawful taking of their property without just compensation in violation of the Nebraska and U.S. Constitutions.
[16] The Nebraska Constitution provides that the "property of no person shall be taken or damaged for public use without just compensation."[51] The 5th Amendment to the federal Constitution, made applicable to the states through the 14th Amendment, provides: "[N]or shall private property be taken for public use, without just compensation."[52] Nebraska's constitutional right to just compensation includes compensation for damages occasioned in the exercise of eminent domain and, therefore, is broader than the federal right, which is limited only to compensation for a taking.[53] We have noted, however, that notwithstanding the difference between the federal and state Constitutions, we have analyzed the state constitutional issue of whether there has been a regulatory taking or damage for a public use by treating federal constitutional case law and our state constitutional case law as coterminous.[54]
The U.S. Supreme Court in Lingle v. Chevron U.S.A. Inc.[55] clarified the law surrounding regulatory takings claims and provided a framework under which such claims are to be addressed. The Court identified two types of regulatory actions that constitute categorical or per se takings: *359 "First, where government requires an owner to suffer a permanent physical invasion of her propertyhowever minorit must provide just compensation."[56] Compensation is required for physical takings "however minimal the economic costs [they] entail[]," because they "eviscerate[] the owner's right to exclude others from entering and using her property perhaps the most fundamental of all property interests."[57] The "second categorical rule applies to regulations that completely deprive an owner of `all economically beneficial us[e]' of her property."[58] The complete elimination of a property's value is the determinative factor in this category because the total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.[59]
[17] The Court in Lingle stated that outside these two relatively narrow categories, and the special context of land-use exactions, regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City (Penn Central).[60] Thus, under a Penn Central inquiry, relief is possible from a regulatory taking which does not deprive the owner of all economic use of the property. The standards set forth in Penn Central are designed to allow careful examination and weighing of all relevant circumstances.[61] The Court in Lingle explained that the "[p]rimary" Penn Central factors included "`[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.'"[62] Another relevant factor in discerning whether a taking has occurred is the "`character of the governmental action'for instance whether it amounts to a physical invasion or instead merely affects property interests through `some public program adjusting the benefits and burdens of economic life to promote the common good.'"[63] The Penn Central analysis turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.[64]
[18] In the present case, the Scofields do not allege that the DNR has effected any permanent physical invasion of their property. Nor do they allege that all economically beneficial use of their property has been taken as a result of the regulations at issue. Thus, in order for their takings claims to survive the DNR's motion to dismiss, they must have sufficiently alleged in their complaint that, despite neither permanent physical invasion of their property nor a complete deprivation of all the economically beneficial use of their property, they are nevertheless entitled to compensation based upon the factors discussed in Penn Central. In light of the allegations presented in the Scofields' complaint, and because we must accept as true *360 all facts which are well pled and the proper and reasonable inferences of law and fact which may be drawn therefrom,[65] we conclude that the Scofields have, at least, stated a claim under the Penn Central factors.
[19] The district court, in granting the DNR's motion to dismiss, found that because the Scofields do not have property rights in wild game on their land, the prohibition on hunting as a result of their land's being designated as a refuge did not constitute an unconstitutional taking. The court was correct in that "there is no property right generally in wild game, for the ownership therein is lodged in the state."[66] However, the court incorrectly construed the allegations raised in the Scofields' complaint. As noted by the Scofields in their brief, "it is not the right in the wild game or the right to hunt"[67] for which they are seeking compensation. Rather, they are seeking compensation for the deprivation of their "right to make economically viable use of their property."[68]
[20] In this regard, we have held that "`[t]he right to full and free use and enjoyment of one's property in a manner and for such purposes as the owner may choose, so long as it is not for the maintenance of a nuisance or injurious to others, is a privilege protected by law.'"[69] And in their complaint, the Scofields alleged, among other things, that the regulations have "significantly denied [them] their enjoyment and beneficial (or economically viable) use of a portion of [their] [p]roperty." Furthermore, the Scofields claimed that the regulations have "deprived [them] of recreational income" and have "resulted in a diminishment of the fair market value of such property."
The question at this point is not whether the Scofields will be able to prove these allegations sufficiently to establish a taking, as we do not test the claim's substantive merits under § 6-1112(b)(6). Assuming that these allegations are true, and construing them in the light most favorable to the Scofields, we find that the Scofields have stated a claim for relief under a Penn Central theory of recovery.

DISTRICT COURT'S RELIANCE ON PRIOR CASES
In their final assignment of error, the Scofields argue that the district court, in dismissing their complaint, erred in relying upon factual findings that the court had made in a consolidated opinion of two prior cases. On this note, the Scofields claim that the court's prior decisions "should not have been used to collaterally estop [them] from litigating any of [the] issues or claims raised in this case."[70]
The Scofields' argument is without merit. In granting the DNR's motion to dismiss, the court did not apply principles of collateral estoppel, nor did the court improperly rely upon any factual findings that it had made in a separate case. Rather, as we read the court's opinion, by referencing language from a prior decision, the court was simply iterating legal conclusions that it had previously reached. The court's decision explained and quoted its prior reasoning and conclusions. And in the court's view, the legal reasoning *361 used to reach that conclusion was equally applicable to the Scofields' case.
Simply stated, the district court was explaining its legal basis for reaching its decision in the present case by applying the same legal reasoning it had used in a prior decision, and citing that decision. This was, as a practical matter, no different from our citation to previous decisions in this opinion, where those decisions contain reasoning that is helpful to our analysis of this case. In other words, we disagree with the Scofields' interpretation of the district court's decision and do not find that the district court erred in citing one of its own decisions.
And in any event, as is evident from the above discussion, we have analyzed each of the Scofields' claims for relief and have reached our own conclusions independently of any decision made by the district court. Accordingly, this assignment of error is without merit.

CONCLUSION
While the district court correctly concluded that the DNR did not exceed its authority in using the Canal to establish the boundary of the refuge, and correctly dismissed the Scofields' due process claims, the court erred in concluding that the Scofields did not state a claim for relief, insofar as they alleged that the boundary effected a taking without just compensation, pursuant to Penn Central.[71] The judgment of the court is reversed, and the cause remanded to the district court for further proceedings regarding the Scofields' Penn Central claim for relief.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] See Neb.Rev.Stat. § 37-708(1) (Reissue 2004).
[2] U.S. v. Wheeler, 44 F.Supp.2d 1030 (D.Neb. 1999).
[3] Wheeler, supra note 2.
[4] Id. at 1032.
[5] See Neb. Ct. R. Pldg. § 6-1112(b)(6).
[6] Bauer v. State Game, Forestation and Parks Commission, 138 Neb. 436, 293 N.W. 282(1940).
[7] Myers v. Nebraska Invest. Council, 272 Neb. 669, 724 N.W.2d 776 (2006).
[8] Id.
[9] Clark v. Clark, 275 Neb. 276, 746 N.W.2d 132 (2008).
[10] See § 37-707(2)(a).
[11] See § 37-706(1).
[12] § 37-706(3).
[13] See § 37-706(1) (Cum.Supp.2002).
[14] Introducer's Statement of Intent, L.B. 826, Committee on Natural Resources, 98th Leg., 2d Sess. (Feb. 11, 2004). See, e.g., Wheeler, supra note 2.
[15] Explanation of L.B. 826, Committee on Natural Resources.
[16] Committee on Natural Resources Hearing, L.B. 826, 98th Leg., 2d Sess. 27 (Feb. 11, 2004).
[17] Id. at 38.
[18] Id. at 40.
[19] Id. at 42.
[20] Id.
[21] See Amend. 2606, L.B. 826, Committee on Natural Resources, 98th Leg., 2d Sess. (Feb. 12, 2004).
[22] Floor Debate, L.B. 826, Committee on Natural Resources, 98th Leg., 2d Sess. 11348-49 (Mar. 11, 2004).
[23] DLH, Inc. v. Nebraska Liquor Control Comm., 266 Neb. 361, 665 N.W.2d 629 (2003).
[24] Id.
[25] See Jacobson v. Solid Waste Agency of Northwest Neb., 264 Neb. 961, 653 N.W.2d 482 (2002).
[26] See Schumacher v. Johanns, 272 Neb. 346, 722 N.W.2d 37 (2006).
[27] Chase 3000, Inc. v. Nebraska Pub. Serv. Comm., 273 Neb. 133, 728 N.W.2d 560 (2007).
[28] See Schumacher, supra note 26.
[29] Wheeler, supra note 2.
[30] See Ferer v. Erickson, Sederstrom, 272 Neb. 113, 718 N.W.2d 501 (2006) (court may judicially notice matters of public record without converting motion to dismiss into motion for summary judgment).
[31] See, Neb.Rev.Stat. § 84-906.01 (Cum. Supp.2006); DLH, Inc., supra note 23 (Gerrard, J., concurring; Hendry, C.J., and Connolly, J., join).
[32] See Public Hearing, Department of Natural Resources. "In the Matter of the Proposed New Rules and Regulations Related to the Boundary of the Garden County State Game Refuge to Be Included in Title 459 of the Nebraska Administrative Code" (Feb. 10, 2005).
[33] Id., vol. I at 5.
[34] Id. at 6.
[35] Id.
[36] Id. at 7.
[37] § 37-706(1).
[38] U.S. Const. amend. XIV, § 1; Neb. Const. art. I, § 3.
[39] See Hamit v. Hamit, 271 Neb. 659, 715 N.W.2d 512 (2006).
[40] Whitehead Oil Co. v. City of Lincoln, 245 Neb. 680, 515 N.W.2d 401 (1994).
[41] Eide v. Sarasota County, 908 F.2d 716 (11th Cir. 1990).
[42] Id. at 720.
[43] Id. at 721.
[44] Villas of Lake Jackson, Ltd. v. Leon County, 121 F.3d 610 (11th Cir. 1997).
[45] First Lutheran Church v. Los Angeles County, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).
[46] Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
[47] Villas of Lake Jackson, Ltd., supra note 44, 121 F.3d at 613.
[48] Id. at 612.
[49] Whitehead Oil Co., supra note 40, 245 Neb. at 688, 515 N.W.2d at 408, quoting Euclid v. Ambler Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). See, also, Villas of Lake Jackson, Ltd., supra note 44.
[50] See Kellogg v. Nebraska Dept. of Corr. Servs., 269 Neb. 40, 690 N.W.2d 574 (2005).
[51] Neb. Const. art. I, § 21.
[52] U.S. Const. amend. V. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
[53] Strom v. City of Oakland, 255 Neb. 210, 583 N.W.2d 311 (1998).
[54] Id.
[55] Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).
[56] Id. at 538, 125 S.Ct. 2074. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).
[57] Lingle, supra note 55, 544 U.S. at 539, 125 S.Ct. 2074.
[58] Id., 544 U.S. at 538, 125 S.Ct. 2074 (quoting Lucas, supra note 46).
[59] Lingle, supra note 55.
[60] Penn Central, supra note 52.
[61] Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).
[62] Lingle, supra note 55, 544 U.S. at 538-39, 125 S.Ct. 2074.
[63] Id., 544 U.S. at 539, 125 S.Ct. 2074.
[64] Lingle, supra note 55.
[65] See Kanne v. Visa U.S.A., 272 Neb. 489, 723 N.W.2d 293 (2006).
[66] Bauer, supra note 6, 138 Neb. at 443, 293 N.W. at 285.
[67] Brief for appellants at 29.
[68] Id. (emphasis omitted).
[69] State v. Champoux, 252 Neb. 769, 778, 566 N.W.2d 763, 769 (1997).
[70] Brief for appellants at 33.
[71] Penn Central, supra note 52.