hereby order him disbarred from the practice of law in the State of Nebraska, effective immediately. Respondent shall forthwith comply with all terms of Neb. Ct. R. § 3-316 of the disciplinary rules, and upon failure to do so, he shall be subject to punishment for contempt of this court. Accordingly, respondent is directed to pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 2012) and Neb. Ct. R. §§ 3-310(P) (rev. 2014) and 3-323 of the disciplinary rules within 60 days after orders imposing costs and expenses, if any, are entered by the court.

JUDGMENT OF DISBARMENT.

---

RODEHORST BROTHERS, APPELLANT, V. CITY OF NORFOLK
BOARD OF ADJUSTMENT, APPELLEE.
___ N.W.2d ___

Filed March 28, 2014.    No. S-13-253.

1.  **Zoning: Courts: Appeal and Error.** In appeals involving a decision of a board of adjustment, an appellate court reviews the decision of the district court, and irrespective of whether the district court took additional evidence, the appellate court is to decide if, in reviewing a decision of a board of adjustment, the district court abused its discretion or made an error of law. Where competent evidence supports the district court's factual findings, the appellate court will not substitute its factual findings for those of the district court.

2.  **Abandonment: Intent: Words and Phrases.** Generally, the right to continue a nonconforming use may be lost through abandonment. Abandonment requires not only a cessation of the nonconforming use, but also an intent by the user to abandon the nonconforming use.

3.  **Ordinances: Zoning.** Zoning laws should be given a fair and reasonable construction in light of the manifest intention of the legislative body, the objects sought to be attained, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the law as a whole.

4.  ____: ____. Where the provisions of a zoning ordinance are expressed in common words of everyday use, without enlargement, restriction, or definition, they are to be interpreted and enforced according to their generally accepted meaning.

5.  ____: ____. Nonconforming uses are disfavored because they reduce the effectiveness of zoning ordinances, depress property values, and contribute to the growth of urban blight.

6.  **Zoning: Ordinances: Intent: Time.** Where a zoning law provides for the termination of a legal, nonconforming use after it has been "discontinued" for a

reasonable period, there is no requirement to show intent to abandon the nonconforming use.

7. **Zoning: Ordinances.** Whether a building is *usable* as a nonconforming use does not mean that it is actually *used* in that manner.

8. **Zoning: Ordinances: Words and Phrases.** A "use" variance is one which permits a use other than that prescribed by the particular zoning regulation. An "area" variance, on the other hand, has no relationship to a change of use. It is primarily a grant to erect, alter, or use a structure for a permitted use in a manner other than that prescribed by the restrictions of the zoning ordinance.

9. **Zoning: Ordinances.** Neb. Rev. Stat. § 19-910 (Reissue 2012) allows a board of adjustment to grant a variance from a zoning regulation only if strict application of the regulation, because of the unusual physical characteristics of the property existing at the time of the enactment, would result in exceptional practical difficulties or undue hardships to the owner.

10. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the party's brief.

11. **Zoning: Property.** While property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking.

12. ____: ____. Under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978), relief is possible from a regulatory taking which does not deprive the owner of all economic use of the property.

Appeal from the District Court for Madison County: James G. Kube, Judge. Affirmed.

Glenn A. Rodehorst for appellant.

Clint Schukei, Norfolk City Attorney, for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## I. SUMMARY

Rodehorst Brothers, a partnership (Rodehorst), owns a fourplex apartment building in Norfolk, Nebraska. The parties agree that the building's use as a fourplex (to house up to four families), in an area zoned R-2 for one- and two-family use, was a legal, nonconforming use. Neb. Rev. Stat. § 19-904.01 (Reissue 2012), as well as the applicable zoning ordinance, both provide that the right to continue such a use is lost if it has been discontinued for 1 year. Because the record shows that Rodehorst discontinued the use for 1 year, we conclude that it forfeited its right to continue the use. We also conclude

that the City of Norfolk Board of Adjustment (the Board) lacked authority under Neb. Rev. Stat. § 19-910 (Reissue 2012) to grant a "use" variance to otherwise allow the use to continue and that there was no "taking" of Rodehorst's property. We affirm.

## II. BACKGROUND

Rodehorst applied for several building permits for its apartment building in 2010 and 2011. It applied for permits to replace the roof, fix some electrical issues, and remodel the apartments in the building. The building inspector, Steve Nordhues, granted the first two permits, but denied the third. Nordhues denied the third permit because he concluded that Rodehorst had forfeited its right to continue its nonconforming use of a fourplex in an R-2 district.

### 1. Appeal to the Board

Rodehorst appealed the denial of the permit to the Board. Rodehorst also asked the Board to grant it a use variance to allow it to continue operating the building as a fourplex. At a hearing on September 12, 2012, Rodehorst argued that it did not forfeit its right to continue using the building as a fourplex just because several of its apartments had been unoccupied. And Rodehorst argued that it deserved a variance to continue using the building as a fourplex because, otherwise, it would suffer an undue hardship. The City of Norfolk (the City) argued that Rodehorst had forfeited its right to continue its nonconforming use because it had been discontinued for 1 year and that the Board did not have authority to grant a use variance.

Several people, including Nordhues and a partner of Rodehorst, spoke at the hearing. The Rodehorst partner essentially argued that the property had always been a fourplex, that there were clearly four apartment units, and that its use had not changed simply because some of the apartments had been unoccupied for several years. He also explained that he had been trying to "fix it up" and that there had been work done on the building "off and on."

Nordhues spoke about his reasons for granting and denying Rodehorst's applications for building permits. He explained

that he granted the first two permits because those repairs helped "[e]nsure the health, safety and welfare of the occupants at that time." Nordhues denied the third permit, however, to remodel the four apartments "[b]ecause it was R-2 zoning and [Rodehorst] wanted it multiple use there, multifamily use."

Explaining further, Nordhues said that in his opinion, Rodehorst had forfeited its right to continue its nonconforming use as a fourplex in an R-2 district. In coming to this conclusion, Nordhues relied on § 27-50 of the City's code which provides: "In the event that a nonconforming use is discontinued, or its normal operation stopped, for a period of one year, the use of the same shall thereafter conform to the uses permitted in the district in which it is located."[1] Nordhues explained that based on power and water usage records, "at least two of the apartments hadn't been occupied, one since August 8th of 2007 and the other since April 16th of 2008." A third apartment had not been occupied since March 29, 2010. Thus, Rodehorst had discontinued its nonconforming use by not having more than two apartments occupied for more than 1 year and Rodehorst now was required to comply with the R-2 zoning designation. The Board agreed. The Board also concluded that it did not have authority to grant a use variance.

## 2. Appeal to the District Court

Rodehorst then appealed to the district court. Rodehorst reiterated many of the same arguments that it had made to the Board. It argued that it had not forfeited its right to continue the nonconforming use simply by failing to rent out the apartments. It emphasized that the building remained a fourplex and that its use as such continued whether the apartments were occupied or not. It further argued that even if it had forfeited its right to continue the nonconforming use, the Board erred in concluding it did not have the authority to grant a use variance. And Rodehorst made several arguments as to why the Board's ruling violated its constitutional rights. Primarily,

---

[1] Norfolk Mun. Code, ch. 27, art. V, § 27-50 (2002).

Rodehorst argued that the Board's ruling was an unconstitutional taking.

The district court affirmed the Board's decision in all respects. The court determined that the Board did not have authority to grant a use variance. The court noted that the City's code defined "'variance'" as "'relief from or variation of the provisions of this chapter, **other than use regulations**, as applied to a specific piece of property, as distinct from rezoning.'" The court explained that the Board could grant variances based only on "certain physical characteristics of the actual ground or land in question," rather than the structures placed on the land.

The court also determined that Nordhues' denial of the building permit to remodel the apartments was proper. The court recounted the evidence admitted at the Board hearing; specifically, that Rodehorst had not had more than two apartments occupied in several years, that power and water usage records supported that conclusion, and that Rodehorst had not presented any evidence that "any effort had been made to rent the apartments [or] that the apartments were in a condition to be rented." The court concluded that Rodehorst had "failed to present any evidence that the property had been used as a fourplex within the past twelve months" and that Rodehorst had forfeited its right to continue the nonconforming use.

## III. ASSIGNMENTS OF ERROR

Rodehorst assigns, restated, consolidated, and reordered, that the district court erred in (1) finding that Rodehorst had forfeited its right to continue the nonconforming use by not having more than two apartments occupied for several years, (2) finding that the Board did not have authority to grant a use variance, and (3) failing to find that the Board's ruling was an unconstitutional taking of Rodehorst's property.

## IV. STANDARD OF REVIEW

[1] In appeals involving a decision of a board of adjustment, an appellate court reviews the decision of the district court, and irrespective of whether the district court took additional evidence, the appellate court is to decide if, in reviewing a decision of a board of adjustment, the district court abused its

discretion or made an error of law.[2] Where competent evidence supports the district court's factual findings, the appellate court will not substitute its factual findings for those of the district court.[3]

## V. ANALYSIS

### 1. RODEHORST FORFEITED ITS RIGHT TO CONTINUE ITS NONCONFORMING USE

Rodehorst first argues that both the district court and the Board erred in determining that Rodehorst had forfeited its right to continue its nonconforming use. Rodehorst argues that although some of the apartments in the building were unoccupied for several years, the building's use as a fourplex never changed, primarily because it had all the trappings of a fourplex and the units were available for use. We conclude, however, that because only one or two of the apartments had been occupied for several years, Rodehorst "discontinued" its nonconforming use for 1 year and therefore forfeited its right to continue that use.

### (a) "Discontinued" Versus "Abandoned"

We first begin with the language of the relevant statute and zoning regulation. Because the City is a city of the first class,[4] § 19-904.01 controls the regulation of nonconforming uses. It provides, in pertinent part: "If [a] nonconforming use is in fact discontinued for a period of twelve months, such right to the nonconforming use shall be forfeited and any future use of the building and premises shall conform to the regulation." Section 27-50 of the City's code, also at issue here, similarly provides: "In the event that a nonconforming use is discontinued, or its normal operation stopped, for a period of one year, the use of the same shall thereafter conform to the uses permitted in the district in which it is located."[5] As such, under

---

[2] See, *Hanchera v. Board of Adjustment*, 269 Neb. 623, 694 N.W.2d 641 (2005); *Bowman v. City of York*, 240 Neb. 201, 482 N.W.2d 537 (1992).

[3] See *id.*

[4] See, Neb. Rev. Stat. § 16-101 (Reissue 2012); 2013 Nebraska Directory of Municipal Officials (2013).

[5] Norfolk Mun. Code, *supra* note 1.

these provisions, if a nonconforming use is "discontinued" for 1 year, then the user's right to continue the nonconforming use is lost.

[2] The use of the term "discontinued," as opposed to "abandoned," is important. Generally, the right to continue a nonconforming use may be lost through abandonment.[6] Abandonment requires not only a cessation of the nonconforming use, but also an intent by the user to abandon the nonconforming use.[7] But as various commentators have recognized, where a legislature or other zoning authority has used the word "discontinued," (or other similar term, such as "ceased"), instead of "abandoned," their purpose "is to do away with the need to prove intent to abandon."[8]

Yet despite this clear purpose, some courts have simply interpreted "discontinued" to be synonymous with "abandoned," and still require a showing that the user intended to abandon the nonconforming use.[9] Some courts, however, have concluded that the terms are distinct and that where a zoning regulation uses a term like "discontinued," the zoning authority need not show that a user intended to abandon the nonconforming for the right to continue that use to be lost.[10]

---

[6] See, e.g., 8A Eugene McQuillin, The Law of Municipal Corporations §§ 25-200 and 25-201 (3d ed. 2012); 12 Richard R. Powell & Michael Allan Wolf, Powell on Real Property § 79C.06[3][f] (2008); 1 Kenneth H. Young, Anderson's American Law of Zoning § 6.65 (4th ed. 1996 & Cum. Supp. 2002); 83 Am. Jur. 2d *Zoning and Planning* § 611 (2013).

[7] See, 8A McQuillin, *supra* note 6, § 25-201; 12 Powell & Wolf, *supra* note 6, § 79C.06[3][f][ii]; 1 Young, *supra* note 6; 83 Am. Jur. 2d, *supra* note 6, § 612.

[8] 8A McQuillin, *supra* note 6, § 25:203 at 141. See, also, 12 Powell & Wolf, *supra* note 6, § 79C.06[3][f][iii]; 1 Young, *supra* note 6, § 6.68.

[9] See, e.g., *Dubitzky v. Liquor Control Commission*, 160 Conn. 120, 273 A.2d 876 (1970); *Board of Zoning Adjustment v. Boykin*, 265 Ala. 504, 92 So. 2d 906 (1957). See, also, 8A McQuillin, *supra* note 6, § 25:203; 12 Powell & Wolf, *supra* note 6, 79C.06[3][f][iii]; 1 Young, *supra* note 6, § 6.68; 83 Am. Jur. 2d, *supra* note 6, § 617.

[10] See, e.g., *City of Glendale v. Aldabbagh*, 189 Ariz. 140, 939 P.2d 418 (1997); *Hartley v. City of Colorado Springs*, 764 P.2d 1216 (1988). See, also, 8A McQuillin, *supra* note 6, § 25:203; 12 Powell & Wolf, *supra* note 6, 79C.06[3][f][iii]; 1 Young, *supra* note 6, § 6.68.

For several reasons, we believe the latter approach to be the correct one. Those reasons stem mostly from our decision in *City of Lincoln v. Bruce*.[11] In that case, Billy and Betty Bruce sought to continue having a mobile home on their property even though it conflicted with the applicable zoning regulations. The Bruces challenged the constitutionality of the pertinent statute and zoning regulation. And they argued that, even if the statute and regulation were constitutional, they had a right to continue having a mobile home on the property because there was a mobile home on the property when they bought it; in other words, they had a legal, nonconforming use and a right to continue it.

[3,4] We first dismissed the constitutional challenge to the relevant statute because the Bruces did not notify the Attorney General as required by our procedural rules. We then addressed the Bruces' argument that the applicable zoning regulation was unconstitutionally vague. We stated that

zoning laws should be given a fair and reasonable construction in light of the manifest intention of the legislative body, the objects sought to be attained, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the law as a whole.[12]

And we stated that "[w]here the provisions of a zoning ordinance are expressed in common words of everyday use, without enlargement, restriction, or definition, they are to be interpreted and enforced according to their generally accepted meaning."[13] Applying these principles to the Bruces' vagueness challenge, we found the zoning regulation to be sufficiently clear.

As for the Bruces' argument that they had a right to continue having a mobile home on their property because they had a legal, nonconforming use, we disagreed. We explained that while the Lincoln Municipal Code allowed legal, nonconforming uses to continue, it also "provided that the discontinuance

---

[11] *City of Lincoln v. Bruce*, 221 Neb. 61, 375 N.W.2d 118 (1985).

[12] *Id*. at 65, 375 N.W.2d at 121.

[13] *Id*. See, also, *Thieman v. Cedar Valley Feeding Co*., 18 Neb. App. 302, 789 N.W.2d 714 (2010).

of a nonconforming use for a period of 2 years forfeited the right to reestablish such a nonconforming use thereafter."[14] We reasoned that the Bruces had forfeited their nonconforming use because "there was no mobile home on the Bruces' property for a period of 3 years and 8 months, from May 1969 through January 1973."[15]

Several things from *Bruce* stand out. First, *Bruce* stands for the proposition that we give effect to the intent of the zoning authority, as expressed through the language of the zoning law, by giving the language its plain and ordinary meaning. As mentioned, it is well recognized that where a zoning authority uses the word "discontinued" instead of "abandoned," its purpose "is to do away with the need to prove intent to abandon."[16] That squares with the plain and ordinary meaning of the term "discontinue." Webster's dictionary defines "discontinue" as, for example, to "end the operations or existence of" and to "cease to use."[17] In other words, to discontinue is to stop. To stop something does not require an intent to abandon.

And second, *Bruce* is notable for how it applied the discontinuance provision at issue. The provision, similar to the one here, stated that "'discontinuance of a nonconforming use for a period of 2 years forfeited the right to establish such a nonconforming use thereafter.'"[18] We reasoned that the Bruces had forfeited their nonconforming use because "there was no mobile home on the Bruces' property for a period of 3 years and 8 months."[19] Significantly, we reached that conclusion without regard to whether the Bruces intended to abandon their right to continue the nonconforming use; the passage of the required 2 years was enough.

---

[14] *Bruce, supra* note 11, 221 Neb. at 66, 375 N.W.2d at 122.

[15] *Id*. at 65-66, 375 N.W.2d at 122.

[16] 8A McQuillin, *supra* note 6, § 25:203 at 141. See, also, *Hartley, supra* note 10; 12 Powell & Wolf, *supra* note 6, § 79C.06[3][f][iii]; 1 Young, *supra* note 6, § 6.68.

[17] Webster's Third New International Dictionary of the English Language, Unabridged 646 (1993).

[18] *Bruce, supra* note 11, 221 Neb. at 66, 375 N.W.2d at 122.

[19] *Id*. at 65-66, 375 N.W.2d at 122.

[5,6] We also note that "[n]onconforming uses are disfavored because they reduce the effectiveness of zoning ordinances, depress property values, and contribute to the growth of urban blight."[20] Modern zoning laws generally attempt to eliminate nonconforming uses as quickly as reasonably possible.[21] This policy is best served by recognizing a distinction between a nonconforming use that has been "discontinued" and one that has been "abandoned." We hold that where a zoning law provides for the termination of a legal, nonconforming use after it has been "discontinued" for a reasonable period, there is no requirement to show intent to abandon the nonconforming use.

### (b) Rodehorst "Discontinued"
### Its Nonconforming Use

The remaining question is whether the City met its burden to show that Rodehorst had discontinued its nonconforming use for 1 year.[22] In concluding that it had, both the Board and the district court relied heavily on evidence showing that no more than one or two of the apartments had been occupied for several years. Rodehorst argues that this was error and emphasizes that the nature and characteristics of the building (namely, that it has four separate units and accompanying features) demonstrate that its nonconforming use remained in effect.

[7] As one facet of that argument, Rodehorst argues that because the apartments were available for use, that fact, in and of itself, is sufficient. We disagree. Whether a building is *usable* as a nonconforming use does not mean that it is actually *used* in that manner.[23] To accept Rodehorst's argument otherwise would mean that, short of razing the building or the units themselves, its nonconforming use could never be considered discontinued. But nonconforming uses were

---

[20] *Hartley, supra* note 10, 764 P.2d at 1224.

[21] See, e.g., 8A McQuillin, *supra* note 6, § 25-186; 12 Powell & Wolf, *supra* note 6, § 79C.06[1][a]; 83 Am. Jur. 2d, *supra* note 6, § 555.

[22] See 12 Powell & Wolf, *supra* note 6, § 79C.06[3][f][ii].

[23] See *Cizek v. Concerned Citizens of Eagle River*, 49 P.3d 228 (Alaska 2002).

never meant to exist into perpetuity.[24] We reject this portion of Rodehorst's argument.

As to the relative importance of occupancy and the characteristics of the building, our research has revealed few cases which address similar factual scenarios, i.e., where an owner is operating a multifamily dwelling as a nonconforming use (with features typical of such a dwelling), but which is less than fully occupied. Our research did reveal a short annotation in an American Law Report relatively on point. It framed the issue as "whether less than 100-percent occupancy of a multifamily dwelling unit constitutes abandonment or discontinuance of a multifamily nonconforming use."[25] Though the annotation treats "abandonment" and "discontinuance" as synonymous, its collection of cases is still helpful.

In *Parish of Jefferson v. Boyd*,[26] the Louisiana Court of Appeals held that the right to continue using a triplex in a single-family zone was lost where the building had been used as a single-family residence for 4 years. In so holding, the court relied on witnesses' testimony and utility records demonstrating that only one person resided in the building during the relevant period. The court apparently found it inconsequential that the building had three separate units (though one partition wall had been knocked down), with three kitchens and three bathrooms.[27]

Similarly, in *Pailet v. City of New Orleans, Dept. of Saf.*,[28] the Louisiana Court of Appeals held that the occupancy of a single apartment in a five-apartment building did not preserve its nonconforming use in a single- and two-family zoning district. In *Pailet*, the building owner, an elderly woman, moved out of an apartment in the building to live with her son, but

---

[24] See, e.g., *Duffy v. Milder*, 896 A.2d 27 (R.I. 2006). See, also, 8A McQuillin, *supra* note 6, § 25-186; 12 Powell & Wolf, *supra* note 6, § 79C.06[1][a]; 83 Am. Jur. 2d, *supra* note 6, § 555.

[25] Annot., 40 A.L.R.4th 1012 (1985).

[26] *Parish of Jefferson v. Boyd*, 192 So. 2d 873 (La. App. 1966).

[27] See *id.*

[28] *Pailet v. City of New Orleans, Dept. of Saf.*, 433 So. 2d 1091 (La. App. 1983).

left most of her belongings at the apartment, including furniture and appliances. The evidence showed that the son stopped by the apartment several times a week to check on the apartment so as to discourage vandalism and that he stored some of his things in the garage and used some of the appliances. The court held that the building was "vacant" within the meaning of the applicable ordinance. The court also held that even if it were not considered vacant, the owner's conforming use as a single-family residence for longer than the ordinance's limitation period forfeited the right to continue the nonconforming use. These two cases, *Parish of Jefferson* and *Pailet*, seemingly focused on the degree of occupancy of the building in determining whether the right to continue the nonconforming use had been lost.

Those cases holding differently (that less than 100-percent occupancy did not forfeit the right to continue a nonconforming use), generally focused on the lack of evidence indicating an intent to abandon the nonconforming use.[29] In *Brown v. Gerhardt*,[30] the Supreme Court of Illinois addressed the use of a five-unit apartment building in a single-family zoning area. The court first concluded that discontinuance was equivalent to abandonment. The court then emphasized that "[n]o physical changes were made . . . indicating an intention to change use of the building as a multiple-housing unit" and that "[t]he mere fact that only one family occupied [the building] is not conclusive of intention to abandon it for multiple-dwelling purposes."[31]

Similarly, in *Town of East Greenwich v. Day*,[32] the Rhode Island Supreme Court addressed the use of a two-family dwelling in a single-family zoning area. There, too, the question was whether the user had abandoned the nonconforming use. The court stated that "5 years of nonuse of the dwelling for two-family occupancy was merely evidence of an intent to

---

[29] See, *Brown v. Gerhardt*, 5 Ill. 2d 106, 125 N.E.2d 53 (1955); *Town of East Greenwich v. Day*, 119 R.I. 1, 375 A.2d 953 (1977).

[30] *Gerhardt, supra* note 29.

[31] *Id*. at 110, 125 N.E.2d at 56.

[32] *Town of East Greenwich, supra* note 29.

abandon," but that "[b]ecause that nonuse was unaccompanied by any overt act or failure to act indicating an intent to abandon, it was insufficient to extinguish the vested right to the nonconforming use."[33] The court agreed with the trial judge that a sewage assessment being reduced to accommodate a single family was insufficient to infer an intent to abandon, particularly where the building maintained "characteristics commonly associated with multi-family dwellings [such] as a four-car tandem driveway and separate gas and electric meters, thermostats, and kitchen and bath facilities."[34]

Based on the above cases, the degree of occupancy is the critical factor in determining whether a multifamily dwelling nonconforming use remains in effect, while the existing characteristics of the dwelling (such as separate units and features) generally go to whether the user intended to abandon the nonconforming use. As noted earlier, intent to abandon is not relevant here because the zoning laws speak in terms of discontinuance, which requires only a stoppage of the nonconforming use. Thus, the degree of occupancy of the building is the central inquiry.

Remember that our standard of review is deferential to the district court: We review its decision for abuse of discretion or an error of law, and we will not substitute our own factual findings for those of the district court.[35] Here, the court determined that utility records showed that two of the apartments had been unoccupied since 2007 and 2008. The court therefore concluded that the building had not been *used* as a fourplex for at least 12 months and that Rodehorst had lost its right to continue the nonconforming use. We find no abuse of discretion or error of law in the court's reasoning or conclusion.

We note that this is not a situation where a landlord continuously sought, but was unable to find, new tenants.[36] In other words, this was not a situation where the discontinuance

---

[33] *Id.* at 6-7, 375 A.2d at 956.

[34] *Id.* at 6, 375 A.2d at 955.

[35] See *Hanchera, supra* note 2.

[36] See, e.g., *Flowerree v. City of Concord*, 93 N.C. App. 483, 378 S.E.2d 188 (1989).

was involuntary.[37] Rather, the district court found that "[t]here was no evidence from [Rodehorst] that any effort had been made to rent the apartments and there was no evidence that the apartments were in a condition to be rented." Moreover, there was evidence from the City showing otherwise. The City presented evidence of the building's long-term nonuse at the same time there were low vacancy rates (indicating that tenants were available). The City also presented evidence, through Nordhues, that the apartments were in disrepair when Nordhues visited the building in 2010. From this evidence, a fact finder could infer that Rodehorst had not tried to find new tenants. And "[a] discontinuance period will run where the landlord did not really try to rent the premises."[38]

## 2. The Board Had No Authority to Grant a "Use" Variance

Rodehorst also argues that the Board should have granted it a "use" variance to otherwise allow its nonconforming use to continue. Rodehorst argues that the district court erred in affirming the Board's conclusion that it did not have the authority to consider and grant Rodehorst such a variance. We disagree.

[8] A "use" variance is one which permits a use other than that prescribed by the particular zoning regulation.[39] An "area" variance, on the other hand, has no relationship to a change of use. It is primarily a grant to erect, alter, or use a structure for a permitted use in a manner other than that prescribed by the restrictions of the zoning ordinance.[40]

In this case, § 19-910 controls the granting of variances. Section 19-910 provides, in relevant part:

> (1) The board of adjustment shall . . . have only the following powers: . . . (c) when by reason of exceptional narrowness, shallowness, or shape of a specific piece of

---

[37] See, e.g., *Smith v. Board of Adjustment*, 460 N.W.2d 854 (Iowa 1990).

[38] 8A McQuillin, *supra* note 6, § 25:203 at 146.

[39] See *Alumni Control Board v. City of Lincoln*, 179 Neb. 194, 137 N.W.2d 800 (1965).

[40] See *id.*

property at the time of the enactment of the zoning regulations, or by reason of exceptional topographic conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any enacted regulation . . . would result in peculiar and exceptional practical difficulties to or exceptional and undue hardships upon the owner of such property, to authorize, upon an appeal relating to the property, a variance from such strict application so as to relieve such difficulties or hardship, if such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of any ordinance or resolution.

[9] We give statutory language its plain and ordinary meaning.[41] As evidenced by its language, and as we have held previously, § 19-910 allows a board of adjustment to grant a variance from a zoning regulation "only if strict application of the regulation, *because of the unusual physical characteristics of the property* existing at the time of the enactment," would result in exceptional practical difficulties or undue hardships to the owner.[42] Rodehorst requested a variance based on its desire to continue using its building as a fourplex, not because of any unique physical characteristic of the property. The Board, limited in its ability to grant a variance under § 19-910, did not have authority to grant Rodehorst its requested use variance.[43]

### 3. Application of the Zoning Regulations Did Not Constitute an Unconstitutional Taking of Rodehorst's Property

[10] Although Rodehorst makes several arguments as to why applying the zoning regulations in this manner is

---

[41] See, e.g., *Lozier Corp. v. Douglas Cty. Bd. of Equal.*, 285 Neb. 705, 829 N.W.2d 652 (2013).

[42] *Barrett v. Bellevue*, 242 Neb. 548, 551, 495 N.W.2d 646, 648 (1993) (emphasis supplied) (citing *Bowman, supra* note 2).

[43] Cf. *Whitehead Oil Co. v. City of Lincoln*, 245 Neb. 680, 515 N.W.2d 401 (1994), *disapproved in part on other grounds, Scofield v. State*, 276 Neb. 215, 753 N.W.2d 345 (2008).

unconstitutional, to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the party's brief.[44] Rodehorst assigned as error only the district court's "failure to recognize that this was an unconstitutional taking o[f] property." We therefore will address only that argument.

In most cases where courts address discontinuance provisions, they provide little guidance as to the constitutionality of those provisions. In *City of Lincoln v. Bruce*, this court simply concluded that such provisions are "generally considered a proper exercise of a municipality's power."[45] In *City of Glendale v. Aldabbagh*,[46] the Arizona Supreme Court, after holding that intent to abandon was not required under the cessation prong of a city ordinance, did not address the ordinance's constitutionality. And in *Hartley v. City of Colorado Springs*,[47] the Colorado Supreme Court, after holding that intent to abandon was not required under an ordinance similar to this one, summarily concluded that such provisions are constitutional if they specify a reasonable period for terminating the nonconforming use.

Of those courts that did address the constitutionality of discontinuance provisions, and specifically whether they worked a taking, their analysis is of little help here. In *Hinsdale v. Village of Essex Junction*,[48] the Vermont Supreme Court reasoned that zoning restrictions which "prevent the 'undue perpetuation' of preexisting, nonconforming uses are constitutionally valid," and not regulatory takings, because they substantially advance legitimate state interests. The U.S.

---

[44] See, e.g., *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013).

[45] *Bruce, supra* note 11, 221 Neb. at 66, 375 N.W.2d at 122.

[46] *Aldabbagh, supra* note 10.

[47] *Hartley, supra* note 10.

[48] *Hinsdale v. Village of Essex Junction*, 153 Vt. 618, 626, 572 A.2d 925, 930 (1990) (referencing *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), and *Agins v. Tiburon*, 447 U.S. 255, 100 S. Ct. 2138, 65 L. Ed. 2d 106 (1980), *abrogated, Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005)).

Supreme Court, however, has since repudiated the "'substantially advances'" test, so that reasoning is no longer valid.[49] And although the New Hampshire Supreme Court, in *Dugas v. Town of Conway*,[50] held that a discontinuance provision worked a taking, it did so only under its state constitution, while we generally look to federal law.[51] Further, the *Dugas* court's analysis basically consisted of recognizing that there was a line between a proper exercise of the police power and an unconstitutional taking, and the court agreed with the lower court that a taking had occurred.[52]

[11] Nevertheless, we believe that discontinuance provisions may, in some cases, work a taking and that the framework for analyzing such a claim is clear. It is well settled that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."[53] We analyze such claims under article I, § 21, of the Nebraska Constitution and the 5th Amendment to the U.S. Constitution, made applicable to the states through the 14th Amendment.[54] While the Nebraska Constitution provides broader protection in this area than the U.S. Constitution (compensation for damages as well as for taking), we have treated federal constitutional case law and our state constitutional case law as coterminous.[55]

As we explained in *Scofield v. State*,[56] the U.S. Supreme Court has clarified the law surrounding regulatory takings claims and provided a framework under which such claims are to be addressed. The Court has identified two types of

---

[49] See *Lingle, supra* note 48, 544 U.S. at 545.

[50] *Dugas v. Town of Conway*, 125 N.H. 175, 480 A.2d 71 (1984).

[51] See *Scofield, supra* note 43.

[52] See *Dugas, supra* note 50.

[53] *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922).

[54] See, *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009); *Scofield, supra* note 43.

[55] See *Scofield, supra* note 43.

[56] *Id.*

regulatory actions that constitute categorical or per se takings: (1) where the government requires an owner to suffer a permanent physical invasion of his property, however minor, and (2) where regulations completely deprive an owner of all economically beneficial use of his property.[57] Neither applies here. Outside these two relatively narrow categories (and the special context of land-use exactions, which this is not), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City* (*Penn Central*).[58]

[12] Under *Penn Central*, relief is possible from a regulatory taking which does not deprive the owner of all economic use of the property. The standards set forth in *Penn Central* are designed to allow careful examination and weighing of all relevant circumstances. The U.S. Supreme Court has explained that the "'[p]rimary'" *Penn Central* factors include "'"[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."'"[59] Another relevant factor is the "'"character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good."'"[60] The *Penn Central* analysis turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.[61]

Based on the record before us, we conclude that there was no taking. Although addressing a different type of regulation, we find *Board of Zoning Appeals v. Leisz*[62] instructive. In that

[57] See *id.* (citing *Lingle, supra* note 48).

[58] *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978); *Scofield, supra* note 43.

[59] *Scofield, supra* note 43, 276 Neb. at 232, 753 N.W.2d at 359 (citing *Penn Central, supra* note 58).

[60] *Id.* at 232-33, 753 N.W.2d at 359 (citing *Penn Central, supra* note 58).

[61] See *id.* (citing *Lingle, supra* note 48).

[62] *Board of Zoning Appeals v. Leisz*, 702 N.E.2d 1026 (Ind. 1998).

case, the City of Bloomington, Indiana, passed an ordinance limiting the number of unrelated adults who could live in a single dwelling unit. Bloomington also "enacted a grandfathering provision that permitted owners of properties that became nonconforming uses under the zoning ordinance to preserve their lawful nonconforming use status if they registered it" by a certain date.[63] The prior owners of a nonconforming dwelling (with more than three unrelated adults in each of two units) failed to register their nonconforming use and, under the new provisions, forfeited their right to continue that use. The new owners were denied the continuation of the nonconforming use. The Indiana Supreme Court held that it was not an unconstitutional taking.[64]

Although the court analyzed the takings claim, in part, under the outdated "substantially advances" test, it also analyzed the claim under the *Penn Central* framework. In addressing the economic impact of the regulation, the court noted that where a regulation is "'reasonably related to the promotion of the general welfare,'" as that one was, the U.S. Supreme Court had "'uniformly reject[ed] the proposition that diminution in property value, standing alone, [could] establish a "taking[.]"'"[65] The court also found that the regulation did not affect the owners' "reasonable investment-based expectations," because the owners were well aware of the ordinance, and that the prior owners had failed to register the nonconforming use.[66] Finally, the court noted that the character of the governmental action pointed in favor of no taking, because "[t]he registration requirement [took] nothing from the landowner," but instead "merely require[d] the filing of a form by a designated date."[67] The court noted that "[n]oncompliance with the regulation, not the regulation itself, result[ed] in the forfeiture of a vested

---

[63] *Id.* at 1027.

[64] See *Leisz, supra* note 62.

[65] *Id.* at 1030 (citing *Penn Central, supra* note 58, citing *Euclid v. Ambler Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303 (1926), and *Hadacheck v. Los Angeles*, 239 U.S. 394, 36 S. Ct. 143, 60 L. Ed. 348 (1915)).

[66] *Id.*

[67] *Id.* at 1031.

property right."[68] The court thus concluded that there was no taking.

For similar reasons, we conclude that the regulation here did not work a taking on Rodehorst. The record is not clear on the economic impact of the regulation on Rodehorst. Certainly, Rodehorst will no longer be able to have four separate units in the building, but the record shows that only one or two of the units had been occupied for several years and that the unoccupied units were generally not in a state to be rented. There is also at least a suggestion that were Rodehorst to remodel the four apartments into two larger units, it might be able to earn comparable profits. But even if we were to assume that Rodehorst would lose 50 percent of the value of the property, that level of diminution in value generally does not equate to a regulatory taking under U.S. Supreme Court precedents.[69]

We also conclude that the regulation has not interfered with Rodehorst's reasonable investment-backed expectations. The record shows that Rodehorst bought the fourplex in 1987 and continued to use it as a fourplex, a legal nonconforming use, for many years. Section 19-904.01 was the law before the purchase, and the City adopted its discontinuance provision in 2002. A property owner is presumed to know the law affecting his property.[70] Rodehorst's reasonable expectation was that it could continue its nonconforming use, indefinitely, if it was not discontinued for 1 year. That expectation was met.

Finally, the character of the governmental intrusion weighs in favor of concluding there was not a taking. Though the *Penn Central* language is somewhat vague, these zoning laws seem less like a "'physical invasion'" and more like a ""'public program adjusting the benefits and burdens of economic life

---

[68] *Id.*

[69] See *Penn Central, supra* note 58 (citing *Euclid, supra* note 65, and *Hadacheck, supra* note 65).

[70] See *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S. Ct. 781, 70 L. Ed. 2d 738 (1982).

to promote the common good."'"[71] In essence, discontinuance provisions work gradually over time to eliminate nonconforming uses, a recognized good. And, as in *Leisz*, the regulation here did not outright terminate the nonconforming use, but, rather, allowed Rodehorst to continue the nonconforming use if it did not discontinue the use for 1 year. As in *Leisz*, "[t]he power to protect the property interest rest[ed] solely with the landowner."[72] For these reasons, we conclude that the discontinuance provision at issue here did not work a taking on Rodehorst.

## VI. CONCLUSION

We conclude that Rodehorst discontinued its nonconforming use for 1 year and therefore forfeited its right to continue the use under the relevant zoning laws. We also conclude that the Board did not have authority to grant Rodehorst a use variance and that there was not a taking of Rodehorst's property.

AFFIRMED.

HEAVICAN, C.J., participating on briefs.

----

[71] See *Scofield, supra* note 43, 276 Neb. at 232-33, 753 N.W.2d at 359 (citing *Penn Central, supra* note 58).

[72] *Leisz, supra* note 62, 702 N.E.2d at 1031.

----

STATE OF NEBRASKA, APPELLEE, v.
ANDRE D. ROBINSON, APPELLANT.
___ N.W.2d ___

Filed March 28, 2014.    No. S-13-575.

1. **Postconviction: Proof: Appeal and Error.** A defendant requesting postconviction relief must establish the basis for such relief, and the findings of the district court will not be disturbed unless they are clearly erroneous.
2. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.
3. ____: ____. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.
4. ____: ____. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland*